UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---

DONALD A. LAFRENIERE, individually,
and as representative of a Class of
Participants and Beneficiaries
of the RR Donnelley Savings Plan,

Plaintiff,

v.

R.R. DONNELLEY & SONS, INC.

and

THE BOARD OF DIRECTORS OF
R.R. DONNELLEY & SONS, INC.

and

THE BENEFITS COMMITTEE OF
R.R. DONNELLEY & SONS, INC.

and

JOHN DOES 1-30,

Defendants.

Case No. 20-cv-7158

**CLASS ACTION
COMPLAINT FOR CLAIMS
UNDER 29 U.S.C. § 1132(a)(2)**

---

## COMPLAINT

---

COMES NOW Plaintiff, Donald A. Lafreniere, individually and as representative of a Class of Participants and Beneficiaries on behalf of the RR Donnelley Savings Plan (the "Plan"), by his counsel, WALCHESKE & LUZI, LLC, as and for a claim against Defendants, alleges and asserts to the best of his knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1.      The essential remedial purpose of the Employee Retirement Income Security Act ("ERISA") is "to protect the beneficiaries of private pension plans." *Nachwalter v. Christie*, 805 F.2d 956, 962 (11th Cir. 1986).

2.      The law is settled that ERISA fiduciaries have a duty to evaluate fees and expenses when selecting investments *as well as* a continuing duty to monitor fees and expenses of selected investments and remove imprudent ones. *Tibble v. Edison Int'l,* 135 S. Ct. 1823, 1828 (2015); 29 U.S.C. §1104(a)(1)(A) (fiduciary duty includes "defraying reasonable expenses of administering the Plan;" 29 C.F.R. §2250.404a-1(b)(i) (ERISA fiduciary must give "appropriate consideration to those facts and circumstances" that "are relevant to the particular investment." It is for good reason that ERISA requires fiduciaries to be cost-conscious:

> Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution Plan." *Tibble,* 135 S. Ct. at 1826, by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees.

*Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019).

3.      Defendants R.R. Donnelley & Sons, Co. ("RR Donnelley"), the Board of Directors of R.R. Donnelley & Sons, Co. ("Board Defendants"), the Benefits Committee of R.R. Donnelley & Sons, Co. ("Committee Defendants") and John Does 1-30 (collectively, "Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 401(k) defined contribution pension plan – known as the RR Donnelley Savings Plan ("The Plan") – that it sponsors and provides to its employees.

4.      Plaintiff alleges that during the putative Class Period (December 3, 2014 through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA,

29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiff, and to the other participants of the Plan by, among other things: (1) authorizing the Plan to pay unreasonably high fees for recordkeeping and administration (RK&A); (2) authorizing the Plan to pay unreasonably high fees for managed account services; and (3) failing to disclose to Plan Participants fees associated with the Plan.

5.      These objectively unreasonable RK&A and managed account fees cannot be justified. Defendants' failures breached the fiduciary duties they owed to Plaintiff, Plan Participants, and beneficiaries. Prudent fiduciaries of 401(k) Plans continuously monitor fees against applicable benchmarks and peer groups to identify objectively unreasonable and unjustifiable fees. Defendants did not engage in a prudent decision-making process, as there is no other explanation for why the Plan paid these objectively unreasonable fees for RK&A and managed account services.

6.      To remedy, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) to enforce Defendants' liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from their breaches of fiduciary duty.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. §1331 and pursuant to 29 U.S.C. §1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. §1001 et seq.

8.      This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

9.     Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within the District.

10.     In conformity with 29 U.S.C. §1132(h), Plaintiff will serve this Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

11.     Plaintiff, Donald A. Lafreniere, is a resident of the State of Wisconsin and currently resides in Appleton, Wisconsin, and during the Class Period, was a participant in the Plan under 29 U.S.C. § 1002(7).

12.     Plaintiff worked for RR Donnelley from 2014 through 2017 and was employed in the Maintenance Department.

13.     Plaintiff has Article III standing to bring this action on behalf of the Plan because he suffered an actual injury to his own Plan account in which he is still a Participant, that injury is fairly traceable to Defendants' unlawful conduct, and the harm is likely to be redressed by a favorable judgment.

14.     Claims relating to imprudent decision-making processes, as those in this Complaint, injure all plan participants through receipt of lower returns or payment of excessive costs, and therefore, Plaintiff and the Class Members have suffered actual injury with respect to imprudent Plan-wide decision-making.

15.     It is well settled, moreover, that recovery may be had for the Class Period before Plaintiff personally suffered injury, as that turns on ERISA §502(a)(2) on which his claim rests.

This claim is brought in a representative capacity on behalf of the Plan as a whole and remedies under ERISA §409 protect the entire Plan. Courts have recognized that a plaintiff with Article III standing, like Plaintiff, may proceed under ERISA §502(a)(2) on behalf of the Plan and all participants in the Plan. Plaintiff may seek relief under ERISA §502(a)(2) that sweeps beyond his own injury and beyond any given investment he has held as a Participant in the Plan.

16.     The named Plaintiff and all Participants in the Plan suffered ongoing financial harm as a result of Defendants' continued imprudent and unreasonable fee decisions made with regard to the Plan.

17.     The named Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the RK&A fees, managed account service fees, and total cost comparisons to similarly-sized Plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

18.     The named Plaintiff and all participants in the Plan, having never managed a large 401(k) Plan such as the Plan, lacked actual knowledge of reasonable fee levels and prudent alternatives available to such Plans.

19.     R.R. Donnelley & Sons, Co. ("RR Donnelley") is a company with its principal headquarters located at 35 W. Wacker Dr., Chicago, IL 60601. In this Complaint, "RR Donnelley" refers to the named defendant and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain. RR Donnelley is a leading global provider of multichannel business communications services and marketing solutions. With more than 35,000 employees across 29 countries, RRD offers solutions designed to help companies optimize customer engagement and streamline business operations.

20.     The Plan Administrator of the RR Donnelley Savings Plan is the Benefits Committee of R.R. Donnelley & Sons, Co., located at 35 W. Wacker Drive, Chicago, IL 60601. As the Plan Administrator, the Benefits Committee is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). It has authority and responsibility for the control, management, and administration of the Plan in accordance with 29 U.S.C. § 1102(a). The Benefits Committee has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

21.     RR Donnelley acted through its officers, including the Board Defendants, Committee Defendants, and their members, John Does 1-20, to perform Plan-related fiduciary functions in the course and scope of their business. For these reasons, RR Donnelley is a fiduciary of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

22.     To the extent that there are additional officers and employees of RR Donnelley who are/were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, RR Donnelley officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

23.     The Plan is a "defined contribution" pension plan under 29 U.S.C. § 1102(2)(A) and 1002(34), meaning that RR Donnelley's contribution to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of

participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct.at 1826. Thus, the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly-performing investments are borne by the participants.

24.     The Plan currently has about $1,200,000,000 in assets entrusted to the care of the Plan's fiduciaries. The Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not sufficiently attempt to reduce the Plan's expenses or exercise appropriate judgment to monitor each investment option to ensure it was a prudent choice.

25.     With 17,349 participants in the year 2019, the Plan had more participants than 99.91% of the defined contribution Plans in the United States that filed 5500 forms for the 2019 Plan year. Similarly, with $1,279,899,226 in assets in the year 2019, the Plan had more assets than 99.85% of the defined contribution Plans in the United States that filed 5500 forms for the 2019 Plan year.

## ERISA'S FIDUCIARY STANDARDS

26.     ERISA imposes strict fiduciary standards of loyalty and prudence on Defendants as a Plan fiduciaries. 29 U.S.C. §1104(a)(1) provides in relevant part:

> [A] fiduciary shall discharge his duties with respect to a Plan solely in the interest of the participants and beneficiaries and –
>
> (A) for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the Plan; [and]
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

27.     With certain exceptions, 29 U.S.C. §1103(c)(1) provides in relevant part:

[T]he assets of a Plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan.

28.     29 U.S.C. §1109 provides in relevant part:

Any person who is a fiduciary with respect to a Plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such Plan any losses to the Plan resulting from each such breach, and to restore to such Plan any profits of such fiduciary which have been made through use of assets of the Plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29.     Under ERISA, fiduciaries that exercise any authority or control over Plan assets, including the selection of Plan investments and service providers, must act prudently and for the exclusive benefit of participants in the Plan, and not for the benefit of third parties including service providers to the Plan such as recordkeepers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (Plan assets "shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan").

30.     "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.,* 74 F.3d 420, 435 (3d Cir. 1996); *Katsaros v. Cody*, 744 F.2d 270, 279 (2nd Cir. 1984) (fiduciaries must use "the appropriate methods to investigate the merits" of Plan investments). Fiduciaries must "initially determine, and continue to monitor, the prudence of each investment option available to Plan Participants." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); 29 C.F.R. §2550.404a-1; DOL Adv. Opinion 98-04A; DOL Adv.

Opinion 88-16A. Thus, a defined contribution Plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1828-29.

31.     "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act §7.

32.     29 U.S.C. §1132(a)(2) authorizes Plan Participants to bring a civil action for appropriate relief under 29 U.S.C. §1109.

## DEFINED CONTRIBUTION INDUSTRY

33.     Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. Among many options, employers may make contributions on behalf of all employees and/or make matching contributions based on the employees' elective deferrals.  Employees with money in a plan are referred to as "Participants."

### Recordkeeping and Related Administrative Services

34.     Recordkeeping and related administrative ("RK&A") services are necessary for all defined contribution plans. These services include, but are not limited to, those related to maintaining plan records, tracking participant account balances and investment elections, transaction processing, call center support, participant communications, and trust and custody services. Defendants received a standard package of RK&A services.

35.     Third-party service providers, often known as "recordkeepers," provide RK&A services on behalf of a defined contribution plan. Some recordkeepers provide only recordkeeping and related services and some recordkeepers are subsidiaries of financial services and insurance companies that distribute mutual funds, insurance products, and other investment options.

36.     The market for defined contribution recordkeeping services is highly competitive, particularly for a Plan like Defendants' with large numbers of participants and large amounts of assets.

37.     Since at least the mid-2000s, the fee that RK&A service providers have been willing to accept for providing RK&A services has decreased.

38.     The underlying cost to a recordkeeper of providing the RK&A services to a defined contribution plan is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan.

39.     The incremental cost for a recordkeeper to provide RK&A services for a participant's account does not materially differ from one participant to another and is generally not dependent on the balance of the participant's account.

40.     By the start of the Class Period and during the entire Class Period, the fees that RK&A providers have been willing to accept for providing RK&A services has stabilized and has not materially changed.  In other words, reasonable 2018 RK&A fees are representative of the reasonable RK&A fees during the entire Class Period.

41.     Recordkeepers for relatively larger defined contribution plans, like the Plan here, experience certain efficiencies of scale that lead to a reduction in the per-participant cost as the number of participants increase because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping

arrangements for defined contribution plans. When the number of participants with an account balance increases in a defined contribution plan, the recordkeeper is able to spread the cost of providing recordkeeping services over a larger participant base, thereby reducing the unit cost of delivering services on a per-participant basis.

42.     Therefore, while the total cost to a provider for RK&A services increases as more participants join the Plan, the cost per participant to deliver the services decreases.

43.     Since at least the early 2000s, plan fiduciaries and their consultants and advisors have been aware of this cost structure dynamic for RK&A providers.

44.     Since at least the early 2000s, Defendants should have been aware of this cost structure dynamic for RK&A providers.

45.     Sponsors of defined contribution plans contract for RK&A services separately from any contracts related to the provision of investment management services to plan participants.

46.     The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping services that the recordkeeper provides on behalf of the investment manager, e.g., RK&A services.

47.     As a result, RK&A service providers often make separate contractual arrangements with mutual fund providers. For example, RK&A providers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund.

48.     The fees described in the aforementioned paragraph are known in the defined contribution industry as "revenue sharing."

49.     For example, if a mutual fund has a total expense ratio fee of 0.75%, the mutual fund provider may agree to pay the RK&A provider 0.25% of the 0.75% total expense ratio fee that

is paid by the investor in that mutual fund (in this context the Plan Participant). That 0.25% portion of the 0.75% total expense ratio fee is known as the "revenue sharing."

50.    In the context of defined contribution plans, the amount of revenue sharing is deemed to be the amount of revenue paid by participants that is allocable to RK&A services and, in some cases, other services provided to the Plan. The difference between the total expense ratio and the revenue sharing is known as the "Net Investment Expense to Retirement Plans."

51.    In the context of defined contribution plans, when a Plan adopts prudent and best practices, the Net Investment Expense to Retirement Plans is the actual amount a Plan Participant pays for the investment management services provided by a portfolio manager.

52.    Providers of retirement plan services, including RK&A services, typically collect their fees through direct payments from the Plan or through indirect compensation such as revenue sharing, or some combination of both.

53.    For purposes of this Complaint, it is irrelevant how providers of retirement plan services collect their fees, as either method can lead to Plans paying objective unreasonable recordkeeping fees.

54.    Regardless of the pricing structure that the Plan Fiduciary negotiates with the recordkeeper, the amount of compensation paid to the recordkeeper for the RK&A services must be reasonable.

55.    As a result, plan Fiduciaries must understand the total dollar amounts paid to their RK&A provider and be able to determine whether the compensation is reasonable by understanding what the market is for the RK&A services received by the Plan.

56.    Because RK&A fees are actually paid in dollars and because of the cost dynamic noted in the aforementioned paragraphs, the fees paid for RK&A services are evaluated and

compared on a dollar per participant basis.

57.     It is well known among retirement Plan consultants and advisors (who often act as co-fiduciaries to the Plan Fiduciaries) that, all else being equal, a Plan with more participants can and will receive a lower effective per participant fee when evaluated on a per participant basis.

58.     During the Class Period, Defendants knew and/or were aware that a Plan with more participants can and will receive a lower effective per participant fee when evaluated on a per participant basis.

59.     During the Class Period, Defendants knew and/or were aware that the Plan should have received a lower effective per participant fee when evaluated on a per participant basis.

**Managed Account Service Fees**

60.     During the Class Period, Defendants selected and made available to Plan Participants managed account services.

61.     In general, managed account services are investment services under which a participant pays a fee to have a managed account provider invest her account in a portfolio of preselected investment options.

62.     Managed account providers "generally offer the same basic service—initial and ongoing investment management of a 401(k) plan participant's account based on generally accepted industry methods." The United States Government Accountability Office ("GAO"), *401(K) PLANS: Improvements Can Be Made to Better Protect Participants in Managed Accounts*, at 14 (June 2014), available at https://www.gao.gov/assets/670/664391.pdf.

63.     The assets of a participant signing up for a managed account service are generally managed based upon a program designed by the managed account provider that purportedly

customizes the participant's portfolio based upon factors such as their risk tolerance and the number of years before they retire.

64.     In practice, however, there is often little to no material customization provided to participants which results in no material value to participants.

65.     In fact, many managed account services merely mimic the asset allocations available through a target date fund while charging additional unnecessary fees.

66.     Participants who sign up for managed account services are generally charged an annual fee that is a percentage of the participant's account balance. The fee rates for these services are often tiered. For example, the first $50,000 of assets may be charged a certain fee rate, the next $25,000 in assets at a lower fee rate, and all remaining assets at a still-lower fee rate. This is appropriate because the marginal cost to manage the additional assets for the participant is essentially $0.

67.     In other words, the cost to manage the account of a participant with $25,000 is the same as the cost to manage the account of a participant with $250,000. The economies of scale for manages account services are even greater than for recordkeeping services.

68.     The participant has no control over the fee rate they are charged if they use the managed account service. The fee levels are determined at the plan level through a contractual agreement between the managed account provider and plan fiduciaries.

69.     When managed account services were first introduced roughly 25 years ago, these fee rates were generally fixed by either the managed account provider or the recordkeeper, leaving little or no room for negotiation.

70.     For at least the past decade, however, larger plans have been able to negotiate multiple facets of the fees charged by managed account providers such as both the asset levels at

which a particular fee tier starts (e.g., the highest tier applies to the first $25,000 versus the first $100,000), as well as the fee rate charged at each asset level.

71.     Managed account services are often offered by recordkeepers to increase the revenue they generate through their relationship with a retirement plan.  In some cases, the recordkeeper outsources the investment management services to a third-party provider, e.g., Morningstar, and charges a fee to the plan higher than what the third-party provider charges the recordkeeper.  In other cases, the recordkeeper provides all the services.

72.     In many cases, the recordkeeper will promote the managed account services over other potential solutions because the recordkeeper will earn more revenue when the managed account services are used.

73.     As with any service provider, one of the most important factors when selecting a managed account provider is fees. Managed account services have historically been expensive compared to other alternatives, such as target date funds that provide the materially same service (e.g., an automated time-based dynamic asset allocation creation and rebalancing solution).

74.     Prior to and during the Class Period, this industry segment has matured over the past decade and the costs of providing managed account services have declined and competition has increased. As a result, the fees providers are willing to accept for managed account services have been declining for several years.

75.     As with recordkeeping services, prudent fiduciaries will regularly monitor the amount of managed account service fees the plan is paying and will ensure the fees are reasonable compared to what is available in the market for materially similar services.

76.     The most effective way to ensure a plan's managed account service fees are reasonable is to periodically solicit bids from other managed account service providers.

77.     As a result, a prudent plan fiduciary ensures that the fee rates are tiered as is common in the retirement plan industry, especially for larger plans.

78.     Defendants caused Plan Participants to pay excessive fees for the managed account services it made available to Plan Participants by not periodically soliciting bids from other managed account service providers.

## THE PLAN

79.     At all relevant times, the Plan's fees were excessive when compared with other comparable 401(k) Plans offered by other sponsors that had similar numbers of plan participants, and similar amounts of money under management. The fees were also excessive relative to the RK&A and managed account services received. These excessive fees led to lower net returns than participants in comparable 401(k) Plans enjoyed.

80.     During the Class Period, Defendants breached their duties owed to the Plan, to Plaintiff and all other Plan Participants, by: (1) failing to monitor the RK&A fees paid by the plan to ensure that they were reasonable and, as a result, authorizing the plan to pay objectively unreasonable and excessive RK&A fees, relative to the RK&A services received; (2) authorizing the Plan to pay unreasonably high fees for managed account services; and (3) failing to disclose to Plan Participants fees associated with the Plan.

81.     Defendants' mismanagement of the Plan, to the detriment of Plan Participants and beneficiaries, breached the fiduciary duties of prudence and loyalty in violation of 29 U.S.C. §1104.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES
## SELECTING & MONITORING RECORDKEEPERS

82.     A Plan Fiduciary is required to fully understand all sources of revenue received by its RK&A service provider/recordkeeper. It must regularly monitor that revenue to ensure that the compensation received by the recordkeeper is and remains reasonable for the services provided.

83. Prudent Plan Fiduciaries ensure they are paying only reasonable fees for RK&A services by soliciting competitive bids from other service providers to perform the same services currently being provided to the Plan. This is not a difficult or complex process and is performed regularly by prudent Plan Fiduciaries. Plan Fiduciaries need only request a bid from salespeople at other service providers. For Plans with as many participants as Defendants' Plan, most recordkeepers would require only the number of participants and the amount of the assets to provide a quote while others might only require the number of participants.

84. Prudent Plan Fiduciaries have all of this information readily available and can easily receive a quote from other service providers to determine if the current level of fees is reasonable.

85. Having received bids, the prudent Plan Fiduciary can negotiate with its current provider for a lower fee and/or move to a new provider to provide the same (or better) services for a competitive reasonable fee.

86. Prudent plan Fiduciaries follow this same process to monitor the fees of retirement Plan advisors and/or consultants as well as any other covered service providers.

87. After the revenue requirement is negotiated, the plan Fiduciary determines how to pay the negotiated RK&A fee. The employer/Plan Sponsor can pay the recordkeeping fee on behalf of participants, which is the most beneficial to plan Participants. If the employer were paying the fee, the employer would have an interest in negotiating the lowest fee a suitable recordkeeper would accept. Usually, however, the employer decides to have the Plan (Plan Participants) pay the recordkeeping fee instead. If the recordkeeping fee is paid by Plan Participants, the Plan Fiduciary can allocate the negotiated recordkeeping fee among participant accounts at the negotiated per-participant rate, or pro-rata based on account values, among other less common ways.

88.     In other words, if the Plan negotiates a per participant revenue threshold, e.g., $45.00, the Plan does not need to require that each participant pay $45.00. Rather, the Plan Fiduciary could determine that an asset-based fee is more appropriate for Plan Participants and allocate the RK&A fee pro rata to participants. For example, a 10,000-participant Plan with a $45.00 revenue threshold would pay $450,000 for RK&A services. If the Plan had $450,000,000 in assets, then the $450,000 would work out to 10 basis points. Accordingly, the Plan Fiduciary could allocate the $450,000 to Plan Participants by requiring that each participant pay 10 basis points.

89.     In an asset-based pricing structure, the amount of compensation received by the service provider is based on a percentage of the total assets in the Plan. This structure creates situations in which the RK&A services provided by the recordkeeper do not change but, because of market appreciation and contributions to the Plan, the revenue received by the recordkeeper increases. This structure was historically preferred by recordkeepers because it allowed recordkeepers to obtain an increase in revenue without having to ask the client to pay a higher fee.

90.     Regardless of the pricing structure negotiated by the Plan Fiduciary, the Plan Fiduciary must ensure that the fee paid to the recordkeeper for RK&A services is reasonable for the level of services provided.

91.     All of these standards were accepted and understood by prudent Plan Fiduciaries, including Defendants, at all times during the Class Period.

92.     For example, fiduciary best practices based on DOL guidelines, case law, and marketplace experience are as follows:

1. Price administrative fees on a per-participant basis.
2. Benchmark and negotiate recordkeeping and investment fees separately.
3. Benchmark and negotiate investment fees regularly, considering both fund vehicle and asset size.
4. Benchmark and negotiate recordkeeping and trustee fees at least every other year. . . .

7. Review services annually to identify opportunities to reduce administrative costs.[1]

93.     During the Class Period, Defendants' Plan recordkeeper has been Great-West Life & Annuity Insurance ("Great-West"), which is a well-known provider of RK&A and investment management services.

94.     Prudent fiduciaries implement three related processes to prudently manage and control a Plan's recordkeeping costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (holding that fiduciaries of a 401(k) Plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the Plan); *George v. Kraft Foods Glob.*, Inc., 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution Plan Fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

95.     First, a Plan Fiduciary must pay close attention to the recordkeeping fees being paid by the Plan. A hypothetical prudent Fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

96.     Second, to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a Plan, a prudent hypothetical Fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the Plan's recordkeeper. To the extent that a Plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable

---

[1] "Fiduciary Best Practices," *DC Fee Management — Mitigating Fiduciary Risk and Maximizing Plan Performance*, Mercer Investment Consulting (2013).

levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the Plan and its Participants.

97.     Third, a hypothetical plan Fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other Plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the Plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three (3) years as a matter of course, and more frequently if the Plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar Plans.

98.     By merely soliciting bids from other providers a prudent Plan Fiduciary can quickly and easily gain an understanding of the current market for similar RK&A services and have an idea of a starting point for negotiation.  Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids through some process. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (failure to solicit bids, and higher-than-market recordkeeping fees, supported triable fiduciary breach claim).

## THE PLAN'S FIDUCIARIES DID NOT EFFECTIVELY MONITOR RK&A FEES AND, AS A RESULT, THE PLAN PAID UNREASONABLE RK&A FEES

99.     A Plan Fiduciary must continuously monitor its RK&A fees by regularly soliciting competitive bids to ensure fees paid to covered service providers (such as recordkeepers) are reasonable.

100.     During the Class Period, Defendants knew or should have known that they must regularly monitor the Plan's RK&A fees paid to covered service providers, including but not limited to Great-West.

101.     During the Class Period, Defendants failed to regularly monitor the Plan's RK&A

fees paid to covered service providers, including but not limited to Great-West.

102.     During the Class Period, Defendants knew or should have known that they must

regularly solicit quotes and/or competitive bids from covered service providers, including but not

limited to Great-West, in order to avoid paying objectively unreasonable fees for RK&A services.

103.     During the Class Period, Defendants failed to regularly solicit quotes and/or

competitive bids from covered service providers, including but not limited to Great-West, in order

to avoid paying unreasonable fees for RK&A services.

104.     During the Class Period, Defendants knew or should have known that it was in the

best interests of the Plan's Participants to ensure that the Plan paid no more than a competitive

reasonable fee for RK&A services.

105.     During the Class Period, and unlike a hypothetical prudent Fiduciary, Defendants

failed to ensure that the Plan paid no more than a competitive reasonable fee for RK&A services.

106.     During the Class Period, and unlike a hypothetical prudent Fiduciary, Defendants

did not have process in place to ensure that the Plan paid no more than a competitive reasonable fee

for RK&A services. Alternatively, to the extent there was a process in place that was followed by

Defendants, it was done so ineffectively given the objectively unreasonable fees paid for RK&A

services.

107.     During the Class Period, and unlike a hypothetical prudent Fiduciary, Defendants

did not engage in any objectively reasonable and/or prudent efforts to ensure that the Plan paid no

more than a competitive reasonable fee for RK&A services.

108.     During the Class Period and because Defendants failed to regularly monitor the

Plan's RK&A fees paid to covered service providers, including but not limited to Great-West, the

Plan's RK&A service fees were significantly higher than they would have been had Defendants engaged in this process.

109.    During the Class Period and because Defendants did not regularly solicit quotes and/or competitive bids from covered service providers, including but not limited to Great-West, before and/or when paying fees for RK&A services, the Plan's RK&A service fees were significantly higher than they would have been had Defendants engaged in these processes. Alternatively, to the extent there was a process in place that was followed by Defendants, it was done so ineffectively given the objectively unreasonable fees paid for RK&A services.

110.    During the Class Period and because Defendants did not engage in any objectively reasonable and/or prudent efforts when paying fees for RK&A services to covered service providers, including but not limited to Great-West, these RK&A service fees were significantly higher than they would have been had Defendants engaged in these efforts.

111.    From the years 2014 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below shows the actual year-end participants and annual RK&A fees illustrating that the Plan had on average 25,639 participants and paid an average effective annual RK&A fee of at least approximately $2,024,509, which equates to an average of at least approximately $79 per participant.

112.    As can be seen from the table below, during 2014 and 2015 the Plan had more than twice as many participants as compared to 2016-2019.  That is because in October 2016 the Plan's sponsor, R.R. Donnelley & Sons Company, completed its spin-offs of its publishing and retail-centric print services and office products businesses.  These spin-offs resulted in a number of plan participants and their assets becoming participants in two new plans.

| Recordkeeping and Administration (RK&A) Fees | | | | | | |
|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Average |
| Participants | 41,651 | 43,115 | 16,966 | 17,484 | 17,271 | 17,349 | 25,639 |
| Est. RK&A Fees | $2,299,182 | $3,205,317 | $2,487,630 | $1,786,370 | $1,778,252 | $590,302 | $2,024,509 |
| Est. RK&A Per Participant | $55 | $74 | $147 | $102 | $103 | $34 | $79 |

113.    As a result, in 2015 the Plan was relatively larger having more participants than 99.98% of plans and more assets than 99.96% of plans thereby having substantial leverage to negotiate reasonable fees.   As noted above, however, even after the corporate spin-offs, the Plan was still in the top 1% of plans in terms of both assets and participants giving it substantial leverage.

114.    Prior to the corporate spin-offs, from the years 2014 through 2015 and based upon the best publicly available information which was equally or even more easily available to Defendants during the Class Period, the table below illustrates the annual RK&A fees paid by other comparable Plans with a similar number of participants and a similar amount of plan assets, compared to the average annual RK&A Fees paid by the Plan during 2014 and 2015.

**Comparable Plans' RK&A Fees Based on Publicly Available Information from Form 5500[1]**

| Plan | Participants | Assets | RK&A Price | RK&A Price /pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | $1,040,153 | $33 | Alight | White |
| Harris Teeter Supermarkets, Inc. Retirement And Savings Plan | 32,081 | $848,829,579 | $1,215,762 | $38 | T. Rowe Price | White |
| Kindred 401(k) | 34,092 | $1,299,328,331 | $1,121,564 | $33 | T. Rowe Price | White |
| The Savings And Investment Plan | 34,303 | $2,682,563,818 | $1,130,643 | $33 | Vanguard | White |
| Honda 401(k) Savings Plan | 34,371 | $4,300,380,053 | $1,267,598 | $37 | Fidelity | White |
| Thermo Fisher Scientific Inc. 401(K) Retirement Plan | 35,739 | $4,320,623,419 | $178,795 | $5 | T. Rowe Price | White |
| **RR Donnelley Savings Plan Average Fee** | **42,383** | **$2,621,877,431** | **$2,752,250** | **$65** | **Great-West** | **Red** |
| The Dow Chemical Company Employees' Savings Plan | 40,596 | $10,766,545,647 | $1,322,048 | $33 | Fidelity | White |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 47,358 | $3,104,524,321 | $1,298,775 | $27 | Vanguard | White |

[1]Price calculations are based on 2018 Form 5500 information or the most recent Form 5500 if 2018 is not available.

115.    Prior to the corporate spin-offs, from the years 2014 through 2015 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the graph below illustrates the annual RK&A fees paid by other comparable Plans with a similar number of participants and a similar amount of plan assets, compared to the average annual RK&A Fees paid by the Plan (as identified in the table above), with the white data points representing RK&A fees that RK&A providers offered to (and were accepted by) comparable Plans.



116.    Prior to the corporate spin-offs, from the years 2014 to 2015 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrates that the Plan paid an effective average annual RK&A fee paid of at least $65 per participant for RK&A services.

117.    Prior to the corporate spin-offs, from the years 2014 through 2015 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrate that a hypothetical prudent plan Fiduciary would have paid on average an effective annual RK&A fee of around $30 per participant, if not lower.

118.    After the corporate spin-offs, from the years 2016 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants

during the Class Period, the table below illustrates the annual RK&A fees paid by other comparable Plans with a similar number of participants and a similar amount of plan assets, compared to the average annual RK&A Fees paid by the Plan from 2016 through 2019.

**Comparable Plans' RK&A Fees Based on Publicly Available Information from Form 5500[1]**

| Plan | Participants | Assets | RK&A Price | RK&A Price /pp | Recordkeeper | Graph Color |
|------|--------------|--------|------------|----------------|--------------|-------------|
| Vibra Healthcare Retirement Plan | 9,750 | $107,652,510 | $277,532 | $28 | Great-West | White |
| Centerpoint Energy Savings Plan | 9,802 | $2,108,802,293 | $442,946 | $45 | Voya | White |
| Republic National 401(K) Plan | 9,922 | $671,989,837 | $324,171 | $33 | Great-West | White |
| Southern California Permanente Medical Group Tax Savings Retirement Plan | 10,770 | $773,795,904 | $333,038 | $31 | Vanguard | White |
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $460,727 | $35 | Fidelity | White |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | $472,673 | $35 | Fidelity | White |
| DHL Retirement Savings Plan | 14,472 | $806,883,596 | $483,191 | $33 | Fidelity | White |
| Dollar General Corp 401(k) Savings and Retirement Plan | 16,125 | $355,768,325 | $516,000 | $32 | Voya | White |
| **RR Donnelley Savings Plan Average Fee** | **17,268** | **$1,186,143,133** | **$1,660,639** | **$96** | **Great-West** | **Red** |
| Sanofi U.S. Group Savings Plan | 24,097 | $5,522,720,874 | $558,527 | $23 | T. Rowe Price | White |
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | $1,040,153 | $33 | Alight | White |

[1]Price calculations are based on 2018 Form 5500 information or the most recent Form 5500 if 2018 is not available.

119.    After the corporate spin-offs, from the years 2016 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the graph below illustrates the annual RK&A fees paid by other comparable Plans with a similar number of participants and a similar amount of plan assets, compared to the average annual RK&A Fees paid by the Plan (as identified in the table above),

with the white data points representing RK&A fees that RK&A providers offered to (and were accepted by) comparable Plans.



120.     After the corporate spin-offs, from the years 2016 to 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrates that the Plan paid an effective average annual RK&A fee paid of $96 per participant for RK&A services.

121.     After the corporate spin-offs, from the years 2016 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrate that a hypothetical prudent plan Fiduciary would have paid on average an effective annual RK&A fee of around $32 per participant, if not lower.

122.    From the years 2014 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other Plans of similar sizes with similar amounts of money under management, had Defendants been acting in the exclusive best interest of the Plan's Participants the Plan actually would have paid significantly less than an average of approximately $2,024,509 per year in RK&A fees, which equated to an effective average of approximately $79 per participant per year.

123.    From the years 2014 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other Plans of similar sizes with similar amounts of money under management, had Defendants been acting in the best interests of the Plan's Participants, the Plan actually would have paid on average a reasonable effective annual market rate for RK&A services of approximately $721,565 per year in RK&A fees, which equates to approximately $28 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan Fiduciary would not agree to pay almost triple what they could otherwise pay for materially RK&A services.

124.    From the years 2014 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the Plan additionally cost its Participants on average approximately $1,302,944 per year in RK&A fees, which equates to on average approximately $51 per participant per year.

125.    From the years 2014 to 2019, and because Defendants did not act in the best interests of the Plan's Participants, and as compared to other Plans of similar sizes with similar amounts of money under management, the Plan actually cost its Participants a total minimum amount of approximately $7,817,663 in unreasonable and excessive RK&A fees.

126.    From the years 2014 to 2019 based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, because Defendants did not act in the best interests of the Plan's Participants, and as compared to other Plans of similar sizes with similar amounts of money under management, the Plan actually cost its Participants (when accounting for compounding percentages) a total, cumulative amount in excess of $11,998,475 in RK&A fees.

127.    During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not regularly and/or reasonably assess the Plan's RK&A fees it paid to Great-West.

128.    During the entirety of the Class Period, and unlike a hypothetical prudent Fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the RK&A fees it paid to Great-West vis-à-vis the fees that other RK&A providers would charge for the same services.

129.    During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's administrative costs and RK&A fees it paid to Great-West, but Defendants simply failed to do so.

130.    During the entirety of the Class Period and had Defendants engaged in any regular and/or reasonable examination and competitive comparison of the RK&A fees it paid to Great-West, it would have realized and understood that the Plan was compensating Great-West unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff and the Plan Participants.  The fees were also excessive relative to the RK&A services received.

131.    During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher administrative costs and RK&A fees than they

should have been and/or by failing to take effective remedial actions as described herein, Defendants breached their fiduciary duties to Plaintiff and the Plan Participants.

## THE PLAN'S FIDUCIARIES DID NOT EFFECTIVELY MONITOR MANAGED ACCOUNT SERVICE FEES AND, AS A RESULT, THE PLAN PAID UNREASONABLE MANAGED ACCOUNT SERVICE FEES

132.     During the Class Period, Defendants selected and made available to Plan Participants managed account services.

133.     Defendants caused Plan Participants to pay excessive fees for the managed account services it made available to Plan Participants.

134.     During the Class Period, Defendants selected and made available to Plan Participants a managed account service offered by Advised Assets Group, LLC ("AAG").

135.     According to Defendants' Participant Fee Disclosure Documents, AAG purported to provide participants with an asset allocation mix of funds available within the Plan.

136.     Inexplicably, Defendants did not disclose to Plan Participants the fees associated with AAG in its Participant Fee Disclosure documents.

137.     Upon information and belief, Plan Participants were charged fees when they used AAG.

138.     Alternatively, if there was no fee associated with the AAG managed account services, it is evidence that any alleged value provided by the service was not worth any additional fee.

139.     Additionally, the failure to negotiate a tiered pricing structure for the managed account service selected by Defendants was imprudent and resulted in the payment of excessive fees by Plan Participants.

140.    The Plan's managed account services added no material value to participants to warrant any additional fees. The asset allocations created by the managed account services were not materially different than the asset allocations provided by the age appropriate target date options ubiquitously available to Defendants in the market.

141.    It has been undisputed in the retirement plan industry well prior to the Class Period that offering asset allocation solutions to plan participants in the form of target date funds is a best practice.

142.    Moreover, the purpose of all the managed account services selected and made available by Defendants to Plan Participants is identical, i.e., to provide an automated time-based dynamic asset allocation creation and rebalancing solution that reallocates the asset allocation over time as circumstances change.

143.    Defendants did not follow a prudent and informed decision-making process to warrant the selection of all of the managed account services by making an explicit and informed finding that the additional fees charged by the managed account services were justified and warranted and in the exclusive best interest of Plan Participants.

144.    Defendants did not follow a prudent and informed decision process to warrant the selection of the managed account services by making an explicit and informed finding that Plan Participants using the managed account services were more likely than not to achieve superior retirement outcomes than could be achieved through using free plan design best practices and ubiquitously-available target date funds.

145.    Had the Defendants followed a prudent and informed decision process they could not have concluded that Plan Participants using the managed account services were more likely

than not to achieve superior retirement outcomes than could be achieved through using free plan design best practices and ubiquitously-available target date funds.

146.     Any benefits to Plan Participants would have been outweighed by additional fees because superior performance is never guaranteed, but incremental fees are guaranteed to serve as a drag on investment performance.

147.     As a result, based on the value provided, the reasonable fee for all the Plan's managed account services was zero or very close to zero.

148.     A prudent fiduciary would have conducted periodic cost benchmarking and taken other measures (including issuing an RFP, if necessary), as well as evaluating the incremental value provided to Plan Participants, to ensure that the amounts paid by the Plan for managed account services were reasonable. Had Defendants done so, the Plan would not have paid the excessive managed account service fees that it did.

149.     Based on the excessive amounts paid by the Plan for managed account services, it is reasonable to infer that Defendants failed to prudently monitor and manage the Plan's managed account services.

150.     Defendants' failure to properly monitor or control fees for the Plan's managed account service cost resulted in Plan Participants paying excessive and unreasonable fees and constitutes a breach of fiduciary duty.

**FAILURE TO FULLY DISCLOSE FEES CHARGED OR CREDITED
TO THE PLAN INVESTMENTS**

151.     ERISA imposes a duty on plan administrators to provide to plan participants on a "regular and periodic basis . . . sufficient information regarding the plan, including fees and expenses, and regarding designated investment alternatives, including fees and expenses attendant

thereto, to make informed decisions with regard to the management of their individual accounts" 29 C.F.R. §2550-404a-5(a).

152.    In order to satisfy this requirement, a plan administrator must provide (among other things) (1) an "identification of any designated investment managers," (2) "an explanation of any fees and expenses that may be charged against the individual account of a participant or beneficiary … not reflected in the total annual operation expenses of any designated investment alternatives," and (3) "at least quarterly, a statement" reflecting the dollar amount and nature of those expenses "actually charged," along with a "description of the services to which the charges relate." 29 C.F.R. §2550- 404a-5(b)-(d).

153.    Defendants failed to properly disclose the fees charged to Participants in the Plan in their quarterly statements and 404a-5 participant fee disclosure documents.

154.    As a result, Plan Participants are not able to determine how much they actually paid for the RK&A and managed account services provided by the Defendants' recordkeepers nor can Plan Participants therefore calculate the net fee they paid for designated investment alternatives.

155.    Without knowing the portion of the expense ratio allocable to the RK&A and managed account services received by the Participants, each Participant could not make "informed decisions with regard to the management of their individual accounts." 29 C.F.R. §2550-404a-5(a).

156.    For example, if it is critical for a Participant to know the total expense ratio and performance history in order to make an informed investment decision, then it is also critical to know the amount of any credits that could be returned to Participants or could be used to pay for the Plan's administrative expenses. When a rebate is available to reduce the "sticker" price of a product or service, the failure to provide the amount of the rebate prevents a buyer from

understanding the net cost of the product or service.  It is obvious a prudent buyer of the product

or service would need to know whether rebates were available and, if so, the amount of the rebate.

157.    The Defendants' incomplete disclosures are a clear violation of the ERISA

disclosure requirements imposed on all Plan administrators and are also evidence that the

Defendants were imprudent in the administration of the plan.

158.    The failure to disclose all the information a Participant would need to make an

informed investment decision, as required under 29 C.F.R. §2550-404a-5(a), breached the

fiduciary obligations of prudence and loyalty that Defendants owed to Plaintiffs and members of

the Class.

159.    Additionally, Defendants selected and made available to Plan Participants a

managed account service called AAG during the Class Period.

160.    The Defendants failed to disclose the fees associated with AAG in its Participant

Fee Disclosure documents.

161.    Defendants' failure to properly and fully disclose the required information has

prevented Plan Participants from making informed investment decisions.

162.    Plan Participants have been damaged through Defendants' incomplete erroneous

disclosures.

## **CLASS ACTION ALLEGATIONS**

163.    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring

an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan

under 29 U.S.C. §1109(a).

164.    In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the RR Donnelley Savings Plan beginning six (6) years before the commencement of this action and running through the date of judgment, excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan.

165.    The Class includes more than 25,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

166.    There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

- Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

- Whether Defendants breached their fiduciary duties to the Plan;

- What are the losses to the Plan resulting from each breach of fiduciary duty; and

- What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

167.    Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a participant during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

168.    Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they are participants in the Plan during the Class period, have no

interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

169.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

170.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

171.    Plaintiff's attorney is experienced in complex ERISA and class litigation and will adequately represent the Class.

172.    The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts. The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in individual participants' Plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

173. Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

174. Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

**FIRST CLAIM FOR RELIEF**
**Breaches of Duties of Loyalty and Prudence of ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class – RK&A Fees)**

175. Plaintiff restates the above allegations as if fully set forth herein.

176. Defendants are fiduciaries of the Plan under 29 U.S.C. §§1002(21) and/or 1102(a)(1).

177. 29 U.S.C. §1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan.

178. Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges reasonable RK&A fees.

179. During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's RK&A fees were reasonable; manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

180.    During the Class Period, Defendants breached their fiduciary duties of prudence and loyalty to Plan Participants, including Plaintiff, by failing to: ensure that the Plan's RK&A fees were reasonable, properly disclose the fees charged to Participants in the Plan in their quarterly statements or fee disclosures, manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

181.    During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding recordkeeping services and the significant bargaining power the Plan had to negotiate the best fees.

182.    During the Class Period, Defendants breached their duty to Plan Participants, including Plaintiff, by failing to employ a prudent and loyal process by failing to critically or objectively evaluate the cost and performance of the Plan's recordkeeper in comparison to other recordkeeping options.

183.    Through these actions and omissions, Defendants breached their fiduciary duties of prudence and loyalty with respect to the Plan in violation 29 U.S.C. §1104(a)(1)(A).

184.    Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. §1104(a)(1)(B).

185.    As a result of Defendants' breach of fiduciary duty of prudence and loyalty with respect to the Plan, the Plaintiff and Plan Participants suffered objectively unreasonable and unnecessary monetary losses.

186.    Defendants are liable under 29 U.S.C. §§1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2).

**SECOND CLAIM FOR RELIEF**
**Breaches of Duties of Loyalty and Prudence of ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class – Managed Account Service Fees)**

187.    Plaintiff restates the above allegations as if fully set forth herein.

188.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§1002(21) and/or 1102(a)(1).

189.    29 U.S.C. §1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan.

190.    Defendants, as fiduciaries of the Plan, are responsible for selecting a managed account service provider that charges reasonable managed account service fees.

191.    During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's managed account service fees were reasonable; manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

192.    During the Class Period, among other things, Defendants imprudently caused the Plan to pay excessive managed account service fees and failed to properly monitor and control those expenses. Each of the actions and omissions described above and elsewhere in this Complaint demonstrate that Defendants failed to defray reasonable expenses of the Plan, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting

in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of their fiduciary.

193.    During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's managed account providers to make sure they were providing the contracted services at reasonable costs, given the highly competitive market surrounding managed account services and the significant bargaining power the Plan had to negotiate the best fees.

194.    During the Class Period, Defendants breached their duty to Plan Participants, including Plaintiff, by failing to employ a prudent and loyal process by failing to critically or objectively evaluate the cost and performance of the Plan's managed account providers in comparison to other managed account options.

195.    Through these actions and omissions, Defendants breached their fiduciary duties of prudence and loyalty with respect to the Plan in violation 29 U.S.C. §1104(a)(1)(A).

196.    Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. §1104(a)(1)(B).

197.    As a result of Defendants' breach of fiduciary duty of prudence and loyalty with respect to the Plan, the Plaintiff and Plan Participants suffered objectively unreasonable and unnecessary monetary losses.

198.    Defendants are liable under 29 U.S.C. §§1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of

fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief

pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2).

### THIRD CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended
### <u>(Plaintiff, on behalf of himself and Class against Defendant RR Donnelley – RK&A Fees)</u>

199.    Plaintiff restates the above allegations as if fully set forth herein.

200.    RR Donnelley had the authority to appoint and remove members or individuals

responsible for Plan RK&A fees and knew or should have known that these fiduciaries had critical

responsibilities for the Plan.

201.    In light of this authority, RR Donnelley had a duty to monitor those individuals

responsible for Plan RK&A fees to ensure that they were adequately performing their fiduciary

obligations, and to take prompt and effective action to protect the Plan in the event that these

individuals were not fulfilling those duties.

202.    RR Donnelley had a duty to ensure that the individuals responsible for Plan

administration possessed the needed qualifications and experience to carry out their duties (or use

qualified advisors and service providers to fulfill their duties); had adequate financial resources and

information; maintained adequate records of the information on which they based their decisions

and analysis with respect to the Plan's investments; and reported regularly to RR Donnelley.

203.    RR Donnelley  breached its fiduciary duties by, among other things:

a.    Failing to monitor and evaluate the performance of individuals responsible for Plan

RK&A fees or have a system in place for doing so, standing idly by as the Plan suffered significant

losses in the form of unreasonably high RK&A expenses;

b.    Failing to monitor the process by which Plan recordkeepers were evaluated and

failing to investigate the availability of lower-cost recordkeepers; and

c. Failing to remove individuals responsible for Plan RK&A fees whose performance was inadequate in that these individuals continued to pay the same RK&A costs even though benchmarking and using other similar comparators would have showed that maintaining Great-West as record keeper was imprudent, excessively costly, all to the detriment of the Plan and Plan Participants' retirement savings.

204.    As the consequences of the foregoing breaches of the duty to monitor for RK&A fees, the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses.

205.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), RR Donnelley is liable to restore to the Plan all loses caused by its failure to adequately monitor individuals responsible for Plan RK&A fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**FOURTH CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class against Defendant RR Donnelley – Managed Account Service Fees)**

206.    Plaintiff restates the above allegations as if fully set forth herein.

207.    RR Donnelley had the authority to appoint and remove members or individuals responsible for Plan managed account service fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

208.    In light of this authority, RR Donnelley had a duty to monitor those individuals responsible for Plan managed account service fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

209.    RR Donnelley had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use

qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to RR Donnelley.

210.    RR Donnelley breached its fiduciary duties by, among other things:

a.    Failing to monitor and evaluate the performance of individuals responsible for Plan managed account service fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high managed account service expenses;

b.    Failing to monitor the process by which Plan managed account providers were evaluated and failing to investigate the availability of lower-cost managed account providers; and

c.    Failing to remove individuals responsible for Plan managed account service fees whose performance was inadequate in that these individuals continued to pay the same managed account service costs even though benchmarking and using other similar comparators would have showed that maintaining their managed account providers was imprudent, excessively costly, all to the detriment of the Plan and Plan Participants' retirement savings.

211.    As the consequences of the foregoing breaches of the duty to monitor for managed account service fees, the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses.

212.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), RR Donnelley is liable to restore to the Plan all loses caused by their failure to adequately monitor individuals responsible for Plan managed account service fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.     A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligation;

E.     An Order requiring Defendant RR Donnelley to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. §1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against RR Donnelley as necessary to effectuate relief, and to prevent RR Donnelley' unjust enrichment;

F.     An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan Fiduciaries deemed to have breached their fiduciary duties;

H.     An award of pre-judgment interest;

I.     An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.     Such other and further relief as the Court deems equitable and just.

Dated this 3rd day of December, 2020

WALCHESKE & LUZI, LLC
Counsel for Plaintiff

**s/ _James A. Walcheske_** _____
James A. Walcheske, WI State Bar No. 1065635
Scott S. Luzi, WI State Bar No. 1067405
*Pro Hac Vice Motion to be Filed*
Paul M. Secunda, WI State Bar No. 1074127
*Pro Hac Vice Motion to be Filed*

WALCHESKE & LUZI, LLC
125 South Wacker Drive, Suite 300
Chicago, Illinois 60606
Telephone: (262) 780-1953
Fax: (262) 565-6469
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: sluzi@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com