UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DONALD A. LAFRENIERE, individually, and as representative of a Class of Participants and Beneficiaries of the RR Donnelley Savings Plan, | |
| Plaintiff, | Case No. 20-cv-7158 |
| v. | **CLASS ACTION AMENDED COMPLAINT FOR CLAIMS UNDER 29 U.S.C. § 1132(a)(2)** |
| R.R. DONNELLEY & SONS, INC. | |
| and | |
| THE BOARD OF DIRECTORS OF R.R. DONNELLEY & SONS, INC. | |
| and | |
| THE BENEFITS COMMITTEE OF R.R. DONNELLEY & SONS, INC. | |
| and | |
| JOHN DOES 1-30, | |
| Defendants. | |

**AMENDED COMPLAINT**

COMES NOW Plaintiff, Donald A. Lafreniere, individually and as representative of a Class of Participants and Beneficiaries on behalf of the RR Donnelley Savings Plan (the "Plan"), by his counsel, WALCHESKE & LUZI, LLC, as and for a claim against Defendants, alleges and asserts to the best of his knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1.     The essential remedial purpose of the Employee Retirement Income Security Act ("ERISA") is "to protect the beneficiaries of private pension plans." *Nachwalter v. Christie*, 805 F.2d 956, 962 (11th Cir. 1986).

2.     The law is settled that ERISA fiduciaries have a duty to evaluate fees and expenses when selecting investments *as well as* a continuing duty to monitor fees and expenses of selected investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015); 29 U.S.C. §1104(a)(1)(A) (fiduciary duty includes "defraying reasonable expenses of administering the Plan;" 29 C.F.R. §2250.404a-1(b)(i) (ERISA fiduciary must give "appropriate consideration to those facts and circumstances" that "are relevant to the particular investment." It is for good reason that ERISA requires fiduciaries to be cost-conscious:

> Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution Plan." *Tibble,* 135 S. Ct. at 1826, by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees.

*Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019).

3.     Defendants R.R. Donnelley & Sons, Co. ("RR Donnelley"), the Board of Directors of R.R. Donnelley & Sons, Co. ("Board Defendants"), the Benefits Committee of R.R. Donnelley & Sons, Co. ("Committee Defendants") and John Does 1-30 (collectively, "Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 401(k) defined contribution pension plan – known as the RR Donnelley Savings Plan ("The Plan") – that it sponsors and provides to its employees.

4.     Plaintiff alleges that during the putative Class Period (December 3, 2014 through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA,

29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiff, and to the other participants of the Plan by, among other things: (1) authorizing the Plan to pay unreasonably high fees for Retirement Plan Services (including Participant Account Maintenance fees); (2) authorizing the Plan to pay unreasonably high fees for managed account services; and (3) failing to disclose to Plan Participants fees associated with the Plan.

5.      These objectively unreasonable Retirement Plan Services fees and managed account fees cannot be justified. Defendants' failures breached the fiduciary duties they owed to Plaintiff, Plan Participants, and beneficiaries. Prudent fiduciaries of 401(k) Plans continuously monitor fees against applicable benchmarks and peer groups to identify objectively unreasonable and unjustifiable fees. Defendants did not engage in a prudent decision-making process, as there is no other explanation for why the Plan paid these objectively unreasonable fees for Retirement Plan Services and managed account services.

6.      To remedy, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) to enforce Defendants' liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from their breaches of fiduciary duty.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. §1331 and pursuant to 29 U.S.C. §1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. §1001 et seq.

8.      This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

9.     Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within the District.

10.    In conformity with 29 U.S.C. §1132(h), Plaintiff served the initial Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

11.    Plaintiff, Donald A. Lafreniere, is a resident of the State of Wisconsin and currently resides in Appleton, Wisconsin, and during the Class Period, was a participant in the Plan under 29 U.S.C. § 1002(7).

12.    Plaintiff worked for RR Donnelley from 2014 through 2017 and was employed in the Maintenance Department.

13.    Plaintiff has Article III standing to bring this action on behalf of the Plan because he suffered an actual injury to his own Plan account in which he is still a Participant, that injury is fairly traceable to Defendants' unlawful conduct, and the harm is likely to be redressed by a favorable judgment.

14.    Claims relating to imprudent, plan-wide decision-making processes, such as those in this Amended Complaint, injure all plan participants through receipt of lower returns or payment of excessive costs, and therefore, Plaintiff and the Class Members have suffered actual injury with respect to imprudent Plan-wide decision-making.

15.    It is well settled, moreover, that recovery may be had for the Class Period before Plaintiff personally suffered injury, as that turns on ERISA §502(a)(2) on which his claim rests.

This claim is brought in a representative capacity on behalf of the Plan as a whole and remedies under ERISA §409 protect the entire Plan. Courts have recognized that a plaintiff with Article III standing, like Plaintiff, may proceed under ERISA §502(a)(2) on behalf of the Plan and all participants in the Plan. Plaintiff may seek relief under ERISA §502(a)(2) that sweeps beyond his own injury and beyond any given investment he has held as a Participant in the Plan.

16.     The named Plaintiff and all Participants in the Plan suffered ongoing financial harm as a result of Defendants' continued imprudent and unreasonable fee decisions made with regard to the Plan.

17.     The named Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the retirement plan service fees, managed account service fees, and total cost comparisons to similarly-sized Plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

18.     The named Plaintiff and all participants in the Plan, having never managed a large 401(k) Plan such as the Plan, lacked actual knowledge of reasonable fee levels available to such Plans.

19.     R.R. Donnelley & Sons, Co. ("RR Donnelley") is a company with its principal headquarters located at 35 W. Wacker Dr., Chicago, IL 60601. In this Amended Complaint, "RR Donnelley" refers to the named defendant and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain. RR Donnelley is a leading global provider of multichannel business communications services and marketing solutions. With more than 35,000 employees across 29 countries, RR Donnelley offers solutions designed to help companies optimize customer engagement and streamline business operations.

20.    The Plan Administrator of the RR Donnelley Savings Plan is the Benefits Committee of R.R. Donnelley & Sons, Co., located at 35 W. Wacker Drive, Chicago, IL 60601. The Plan states that at least two individuals become members of the Benefit Committee by virtue of either being the company's Treasurer or Vice President. (*RR Donnelley Plan Document* at Arts. §§ 12.1, 12.1(a).4). Because RR Donnelley, through its Board of Directors, hires its Treasurer and Vice President, RR Donnelley and its Board also consequently appoints these same individuals, by operation of the Plan, to be members of the Benefits Committee. Thus, RR Donnelley and its Board have a fiduciary duty to monitor their appointees to the Benefits Committee.

21.    As the Plan Administrator, the Benefits Committee is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). It has authority and responsibility for the control, management, and administration of the Plan in accordance with 29 U.S.C. § 1102(a). The Benefits Committee has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

22.    RR Donnelley acted through its officers, including the Board Defendants, Committee Defendants, and their members, John Does 1-20, to perform Plan-related fiduciary functions in the course and scope of their business. For these reasons, RR Donnelley, the Board Defendants, and the Benefits Committee, are all fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

23.    To the extent that there are additional officers and employees of RR Donnelley who are/were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave

to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, RR Donnelley officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

24.     The Plan is a "defined contribution" pension plan under 29 U.S.C. §§ 1102(2)(A) and 1002(34), meaning that RR Donnelley's contribution to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct.at 1826.

25.     The Plan currently has about $1,200,000,000 in assets entrusted to the care of the Plan's fiduciaries. The Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not sufficiently attempt to reduce the Plan's expenses or exercise appropriate judgment to monitor each investment option to ensure it was a prudent choice.

26.     With 17,349 participants in the year 2019, the Plan had more participants than 99.91% of the defined contribution Plans in the United States that filed 5500 forms for the 2019 Plan year. Similarly, with $1,279,899,226 in assets in the year 2019, the Plan had more assets than 99.85% of the defined contribution Plans in the United States that filed 5500 forms for the 2019 Plan year.

## ERISA'S FIDUCIARY STANDARDS

27.     ERISA imposes strict fiduciary standards of loyalty and prudence on Defendants as a Plan fiduciaries. 29 U.S.C. §1104(a)(1) provides in relevant part:

> [A] fiduciary shall discharge his duties with respect to a Plan solely in the interest of the participants and beneficiaries and –

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and
(ii) defraying reasonable expenses of administering the Plan; [and]

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

28.     With certain exceptions, 29 U.S.C. §1103(c)(1) provides in relevant part:

[T]he assets of a Plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan.

29.     29 U.S.C. §1109 provides in relevant part:

Any person who is a fiduciary with respect to a Plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such Plan any losses to the Plan resulting from each such breach, and to restore to such Plan any profits of such fiduciary which have been made through use of assets of the Plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

30.     Under ERISA, fiduciaries that exercise any authority or control over Plan assets, including the selection of Plan investments and service providers, must act prudently and for the exclusive benefit of participants in the Plan, and not for the benefit of third parties including service providers to the Plan and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (Plan assets "shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan").

31.     "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan*

*Litig.,* 74 F.3d 420, 435 (3d Cir. 1996); *Katsaros v. Cody*, 744 F.2d 270, 279 (2nd Cir. 1984) (fiduciaries must use "the appropriate methods to investigate the merits" of Plan investments). Fiduciaries must "initially determine, and continue to monitor, the prudence of each investment option available to Plan Participants." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); 29 C.F.R. §2550.404a-1; DOL Adv. Opinion 98-04A; DOL Adv. Opinion 88-16A. Thus, a defined contribution Plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1828-29.

32.     "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act §7.

33.     29 U.S.C. §1132(a)(2) authorizes Plan Participants to bring a civil action for appropriate relief under 29 U.S.C. §1109.

## DEFINED CONTRIBUTION INDUSTRY

34.     Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. Among many options, employers may make contributions on behalf of all employees and/or make matching contributions based on the employees' elective deferrals.  Employees with money in a plan are referred to as "Participants."

35.     As of September 2020, Americans had approximately $9.3 trillion in assets invested

in defined contribution plans, such as 401(k) and 403(b) plans. See INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $33.1 Trillion in Third Quarter 2020* (Dec. 16, 2020), available at https://www.ici.org/research/stats/retirement/ret_20_q3. Defined contribution plans have largely replaced defined benefit plans—or pension plans—that were predominant in previous generations. See BANKRATE, *Pensions Decline as 401(k) Plan Multiply* (July 24, 2014), available at http://www.bankrate.com/finance/retirement/pensions-decline-as-401-k-Plan-multiply-1.aspx. By 2012, approximately 98% of employers offered defined contribution plans to their current employees, whereas only 3% offered pension plans. *Id.*

36.     Failures by ERISA fiduciaries to monitor fees and costs for reasonableness have stark financial consequences for retirees. Every extra level of expenses imposed upon plan participants compounds over time and reduces the value of participants' investments available upon retirement.

37.     The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees and investment underperformance. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments. But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. Thus, the employer has no incentive to keep costs low or to closely monitor the plan to ensure every investment remains prudent, because all risks related to high fees and poorly performing

investments are borne by the employee.

**Retirement Plan Services**

38.     Retirement Plan Services are necessary for all defined contribution plans. These services include, but are not limited to, those related to maintaining plan records, tracking participant account balances and investment elections, providing participant statements, transaction processing, call center support, participant communications, loan processing and maintenance, participant education or advice services, and trust and custody services.

39.     Typically Plan Sponsors hire one company to provide the vast majority of the Retirement Plan Services. The primary provider of Retirement Plan Services is often generically referred to as a "recordkeeper."  Sometimes plan fiduciaries hire multiple providers in addition to the recordkeeper. All plans with more than 100 employees also require auditing services.  In rare cases, some Plan Sponsors also hire attorneys, but in most cases those services benefit only the plan sponsor and not the participants and should therefore not be paid with plan assets.  As a result, it is unusual to have significant legal services paid by the plan (and its participants) as part of the administration of the plan.

40.     For purposes of this complaint, "Retirement Plan Services" include all the services, including, but not limited to, those described above, that are requested and required of a Retirement Plan Services provider by a plan to deliver the retirement benefit to plan participants, with the following exceptions.  First, it does not include "managed account" services, the fees of which are paid in addition to the fees for the Retirement Plan Services and are paid only by those participants using the service and are covered in a separate section of this complaint.  Second, it does not include, "Investment related expenses paid by the Plan, such as investment management fees [which] are included in net appreciation/(depreciation) in fair value of investments."  *See* 2018 Notes to the

Financial Statements filed with the Plan's 2018 5500 form.

41.     The Plan did not receive anything unique or at a level of quality that would warrant retirement plan service fees greater than the competitive fees that would be offered by other Retirement Plan Services providers in a competitive environment.

42.     Many other retirement plan service providers would have provided the same bundled services received by the Plan at the same or a higher quality of service for a much lower fee.

43.     There are numerous providers of Retirement Plan Services in the market that are capable of providing the same type and quality of services received by the Plan.  These retirement plan providers will vigorously compete to win new business for large defined contribution plans. They will readily respond to an informal request for a bid or a formal request for a proposal and will tailor their bids, if necessary, based on any specific desired services.

44.     The market for these services is highly competitive, particularly for a Plan like Defendants' with large numbers of participants and large amounts of assets, when plan fiduciaries engage in a prudent competitive process. If, however, imprudent plan fiduciaries do not create a competitive process to determine a reasonable fee, then service providers will often propose much higher fees than they would otherwise be willing to accept.

45.      This retirement plan service information is included in the Plan's 408(b)(2) plan sponsor disclosures so that plan sponsors can responsibly select Retirement Plan Services providers, with sufficient information to assess the reasonableness of the terms of the plan's service arrangements.  Under the 408(b)(2) disclosure regulations, covered service providers are required to provide plan sponsors with a reasonable and good faith estimate of the plan's cost for its Retirement Plan Services.

46.     Since at least the mid-2000s, the fee that most types of providers of Retirement Plan Services, especially recordkeepers, have been willing to accept for providing Retirement Plan Services has decreased.

47.     The underlying cost to a service provider of providing most of the Retirement Plan Services to a defined contribution plan is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan.

48.     During the entire Class Period, the fees that service providers have been willing to accept for providing Retirement Plan Services has stabilized and has not materially changed. In other words, reasonable 2018 retirement plan service fees are representative of the reasonable retirement plan service fees during the entire Class Period.

49.     Retirement Plan Service providers for larger defined contribution plans, like the Plan here, experience certain efficiencies of scale that lead to a reduction in the per-participant cost as the number of participants increase because the marginal cost of adding an additional participant to a platform is relatively low. These economies of scale are inherent in all retirement plan service arrangements for defined contribution plans. When the number of participants with an account balance increases in a defined contribution plan, the Retirement Plan Service provider is able to spread the cost of providing Retirement Plan Services over a larger participant base, thereby reducing the unit cost of delivering services on a per-participant basis.

50.     Therefore, while the total cost to a provider for Retirement Plan Services increases as more participants join the Plan, the cost per participant to deliver the services decreases.

51.     Since at least the early 2000s, plan fiduciaries and their consultants and advisors have been aware of this cost structure dynamic for retirement plan providers.

52.     There is little variation in the services provided to large plans by recordkeepers and

other service providers.  For large plans with significant economies of scale, minor differences in the delivery of the required services are immaterial to the effective per participant fee rate.

53.     Providers of Retirement Plan Services typically collect their fees through direct payments from the Plan or through indirect compensation, or some combination of both.

54.     Plan Fiduciaries must understand the total dollar amounts paid to their covered service provider and be able to determine whether the compensation is reasonable by understanding what the market is for the various Retirement Plan Services received by the Plan.

55.     Because retirement plan fees are actually paid in dollars, and because of the cost dynamic noted above, prudent fiduciaries evaluate and compare the fees paid for Retirement Plan Services on a dollar per participant basis.

56.     During the Class Period, Defendants knew or should have known that, all else being equal, a plan with more participants can and will receive a lower effective per participant fee when evaluated on a per participant basis.

**Managed Account Service Fees**

57.     During the Class Period, Defendants selected and made available to Plan Participants managed account services.

58.     In general, managed account services are investment services under which a participant pays a fee to have a managed account provider invest his account in a portfolio of preselected investment options.

59.     Managed account providers "generally offer the same basic service—initial and ongoing investment management of a 401(k)-plan participant's account based on generally accepted industry methods." THE UNITED STATES GOVERNMENT ACCOUNTABILITY

OFFICE ("GAO"), *401(K) PLANS: Improvements Can Be Made to Better Protect Participants in Managed Accounts*, at 14 (June 2014), available at https://www.gao.gov/assets/670/664391.pdf.

60.     The assets of a participant signing up for a managed account service are generally managed based upon a program designed by the managed account provider that purportedly customizes the participant's portfolio based upon factors such as their risk tolerance and the number of years before they retire.

61.     In practice, however, there is often little to no material customization provided to participants which results in no material value to participants.

62.     In fact, many managed account services merely mimic the asset allocations available through a target date fund while charging additional unnecessary fees for their services.

63.     Participants who sign up for managed account services are generally charged an annual fee that is a percentage of the participant's account balance.  The fee rates for these services are often tiered. For example, the first $50,000 of assets may be charged a certain fee rate, the next $25,000 in assets at a lower fee rate, and all remaining assets at a still-lower fee rate. This is appropriate because the marginal cost to manage the additional assets for the participant is essentially $0.

64.     In other words, the cost to manage the account of a participant with $25,000 is the same as the cost to manage the account of a participant with $250,000. The economies of scale for manages account services are even greater than for Retirement Plan Services.

65.     The participant has no control over the fee rate they are charged if they use the managed account service. The fee levels are determined at the plan level through a contractual agreement between the managed account provider and plan fiduciaries.

66. For at least the past decade, larger plans have been able to negotiate multiple facets of the fees charged by managed account providers such as both the asset levels at which a particular fee tier starts (e.g., the highest tier applies to the first $25,000 versus the first $100,000), as well as the fee rate charged at each asset level.

67. Managed account services are often offered by recordkeepers or their affiliates to increase the revenue they generate through their relationship with a retirement plan. In some cases, the recordkeeper outsources the investment management services to a third-party provider, e.g., Morningstar, and charges a fee to the plan higher than what the third-party provider charges the recordkeeper . In other cases, the recordkeeper or its affiliate provides all the services.

68. In many cases, the recordkeeper will promote the managed account services over other potential solutions because the recordkeeper will earn more revenue when participants use the managed account services.

69. As with any service provider, one of the most important factors when selecting a managed account provider is fees. Managed account services have historically been expensive compared to other alternatives, such as target date funds that provide the materially same service (e.g., an automated time-based dynamic asset allocation creation and rebalancing solution).

70. This industry segment has matured over the past decade and the costs of providing managed account services have declined and competition has increased. As a result, the fees providers are willing to accept for managed account services have been declining for many years.

71. As with retirement plan service services, prudent fiduciaries will regularly monitor the amount of managed account service fees the plan is paying and will ensure the fees are reasonable compared to what is available in the market for materially similar services.

72.     The most effective way to ensure a plan's managed account service fees are reasonable is to periodically solicit bids from other managed account service providers.

73.     As a result, a prudent plan fiduciary ensures that the fee rates are tiered as is common in the retirement plan industry, especially for larger plans.

74.     Defendants caused Plan Participants to pay excessive fees for the managed account services it made available to Plan Participants by not periodically soliciting bids from other managed account service providers.

75.     The excessive fees paid by Plan Participants using the managed account service were not warranted and did not provide any material value or benefit to those Plan Participants.

## THE PLAN

76.     At all relevant times, the Plan's fees were excessive when compared with other comparable 401(k) Plans offered by other sponsors that had similar numbers of plan participants, similar amounts of money under management, and that received similar retirement plan and managed account services.

77.     During the Class Period, Defendants breached their duties owed to the Plan, to Plaintiff and all other Plan Participants, by: (1) failing to monitor the Retirement Plan Service fees paid by the plan to ensure that they were reasonable and, as a result, authorizing the plan to pay objectively unreasonable and excessive Retirement Plan Service fees, relative to the Retirement Plan Services received; (2) authorizing the Plan to pay unreasonably high fees for managed account services; and (3) failing to adequately disclose to Plan Participants fees associated with the Plan.

78.     Defendants' mismanagement of the Plan, to the detriment of Plan Participants and beneficiaries, breached the fiduciary duties of prudence and loyalty in violation of 29 U.S.C. §1104.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES
## SELECTING & MONITORING SERVICE PROVIDERS

79.     A Plan Fiduciary is required to fully understand all sources of revenue received by its covered service providers. It must regularly monitor that revenue to ensure that the compensation received by covered service providers is and remains reasonable for the services provided.

80.     Prudent Plan Fiduciaries ensure they are paying only reasonable fees for Retirement Plan Services by soliciting competitive bids from other service providers to perform the same services currently being provided to the Plan. This is not a difficult or complex process and is performed regularly by prudent Plan Fiduciaries. Plan Fiduciaries need only request a bid from salespeople at other service providers. For Plans with as many participants as Defendants' Plan, most covered service providers would require only the number of participants and the amount of the assets to provide a quote while others might only require the number of participants.

81.     Prudent Plan Fiduciaries have all of this information readily available and can easily receive a quote from other service providers to determine if the current level of fees is reasonable.

82.     For example, prudent Plan Fiduciaries simply request recordkeepers to provide their revenue requirement on a per participant basis that the recordkeeper would need to administer the Plan.  The Plan Fiduciaries can then use those quotes as a starting point to begin to negotiate a fee rate that includes all the services required by the plan.  The ultimate revenue requirement fee rate structure can be per capita or asset-based, but asset-based fee structures are much more difficult to monitor to ensure that the total fee remains reasonable.

83.     After a revenue requirement is negotiated with the covered service provider, the plan fiduciary determines how to pay the negotiated retirement plan service fees. The employer/Plan Sponsor can pay the retirement plan service fee on behalf of participants, which is

the most beneficial to plan Participants. If the employer were paying the fee, the employer would have an interest in negotiating the lowest fee a suitable covered service provider would accept. Usually, however, the employer decides to have the Plan (Plan Participants) pay most retirement plan service fees instead. If the retirement plan service fee is paid by Plan Participants, the Plan Fiduciary can allocate the negotiated retirement plan service fee among participant accounts at the negotiated effective per-participant rate, or pro-rata based on account values, among other less common ways.

84.     In other words, if the Plan negotiates a per participant revenue threshold, e.g., $40.00, the Plan does not need to require that each participant pay $40.00. Rather, the Plan Fiduciary could determine that an asset-based fee is more appropriate for Plan Participants and allocate the retirement plan service fee pro rata to participants. For example, a 10,000-participant Plan with a $40.00 revenue threshold would pay $400,000 for Retirement Plan Services. If the Plan had $400,000,000 in assets, then the $400,000 would work out to 10 basis points. Accordingly, the Plan Fiduciary could allocate the $400,000 to Plan Participants by requiring that each participant pay 10 basis points.

85.     In an asset-based pricing structure, the amount of compensation received by the service provider is based on a percentage of the total assets in the Plan. This structure creates situations in which the Retirement Plan Services provided by the covered service provider do not change but, because of market appreciation and contributions to the Plan, the revenue received by the covered service provider increases. This structure was historically preferred by covered service providers because it allowed covered service providers to obtain an increase in revenue without having to ask the client to pay a higher fee.

86.     Regardless of the pricing structure negotiated by the Plan Fiduciary, and the

Plaintiff expresses no preference, the Plan Fiduciary must ensure that the total amount of fees paid to the service providers for Retirement Plan Services in dollars is reasonable for the level and quality of services provided.

87.     The standard of care is to know the reasonable market price for the level and quality of the services the Plan is receiving and the standard of care for knowing what the reasonable market price is to solicit bids regularly.

88.     All of these standards were accepted and understood by prudent Plan Fiduciaries, including Defendants, at all times during the Class Period.

89.     During the Class Period, the Plan used Great-West/Empower as its primary Retirement Plan Services provider.

90.     Prudent fiduciaries implement three related processes to prudently manage and control a Plan's retirement plan service costs. *George v. Kraft Foods Glob.*, Inc., 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution Plan Fiduciaries have a "duty to ensure that [the service provider's] fees [are] reasonable").

91.     First, a Plan Fiduciary must pay close attention to the retirement plan service fees being paid by the Plan. A hypothetical prudent Plan Fiduciary tracks the fees received by service providers by demanding documents that summarize and contextualize the service provider's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

92.     Second, to make an informed evaluation as to whether a service provider is receiving no more than a reasonable fee for the services provided to a Plan, a prudent hypothetical Fiduciary must identify and understand all fees being paid to the Plan's service provider. To the extent that a Plan's investments pay asset-based revenue sharing to the service provider, prudent

fiduciaries monitor the amount of the payments to ensure that the service provider's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the Plan and its Participants.

93.     Third, a hypothetical plan Fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other Plans, as well as the retirement plan service rates that are available. This will generally include conducting an RFP at reasonable intervals, and immediately if the Plan's retirement plan service expenses have grown significantly or appear high in relation to the general marketplace or if the Plan's demographics are materially impacted by a merger or spin-off.

94.     That said, it is not necessary or required that a Plan Fiduciary undertake a formal RFP process to determine the range of reasonable retirement plan service fees for the fiduciary's plan. By merely soliciting bids from other providers a prudent Plan Fiduciary can quickly and easily gain an understanding of the current market for similar Retirement Plan Services and have an idea of a starting point for negotiation.  Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids through some process, whether a RFP or other bidding process. *George*, 641 F.3d at 800 (failure to solicit bids, and higher-than-market retirement plan service fees, supported triable fiduciary breach claim).

95.     Furthermore, a prudent fiduciary understands that paying reasonable retirement plan service fees does *not* require changing service providers. On the contrary, prudent plans continually monitor their current Retirement Plan Service fees.  If the fees charged by the incumbent provider are higher than the bids solicited from competitors than the prudent Plan Fiduciary negotiates with its current provider to ensure that the fees are reasonable. In virtually all cases, the incumbent provider will reduce their fees to match the bids of the competitors.

96.     If, however, the incumbent retirement plan service provider unreasonably refuses to reduce the fees, then the prudent Plan Fiduciary moves to a new retirement plan service provider that can provide the materially same level and quality of services at a reasonable fee.

97.     Switching to a new provider that charges a reasonable fee is not a difficult process and it indisputably benefits participants. More than 30,000 plan fiduciaries switch Retirement Plan Service providers every year. All retirement plan service providers have dedicated teams to assist Plan Fiduciaries through the process. For example, all national recordkeepers assign teams of at least three people (and often five or more) to the conversion process. Similarly, Plan Fiduciaries often have consultants or advisors who also provide assistance for no additional fee. There are no explicit fees charged by the new provider (or if they are listed on the fee schedule they are routinely waived).

98.     Finally, prudent plan fiduciaries recognize that any difficulty or inconvenience to the plan sponsor in the context of switching to a new retirement plan service provider is not an appropriate consideration for a plan fiduciary acting for the exclusive interest of plan participants.

### BECAUSE THE PLAN'S FIDUCIARIES DID NOT EFFECTIVELY MONITOR RETIREMENT PLAN SERVICE FEES, THE PLAN PAID UNREASONABLE RETIREMENT PLAN SERVICE FEES

99.     A Plan Fiduciary must continuously monitor its Retirement Plan Service fees by regularly soliciting competitive bids to ensure fees paid to service providers are reasonable.

100.     During the Class Period, Defendants knew or should have known that they must regularly monitor the Plan's retirement plan service fees paid to service providers, including but not limited to Great-West/Empower.

101.     During the Class Period, Defendants failed to regularly monitor the Plan's retirement plan service fees paid to service providers, including but not limited to Great-

West/Empower.

102.    During the Class Period, Defendants knew or should have known that they must regularly solicit quotes and/or competitive bids from covered service providers, including but not limited to Great-West/Empower, in order to avoid paying objectively unreasonable fees for Retirement Plan Services.

103.    During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from service providers, including but not limited to Great-West/Empower, in order to avoid paying unreasonable fees for Retirement Plan Services.

104.    During the Class Period, Defendants knew or should have known that it was in the best interests of the Plan's Participants to ensure that the Plan paid no more than a competitive reasonable fee for Retirement Plan Services.

105.    During the Class Period, and unlike a hypothetical prudent Fiduciary, Defendants failed to ensure that the Plan paid no more than a competitive reasonable fee for Retirement Plan Services.

106.    During the Class Period, and unlike a hypothetical prudent Fiduciary, Defendants did not have a process in place to ensure that the Plan paid no more than a competitive reasonable fee for Retirement Plan Services. Alternatively, to the extent there was a process in place that was followed by Defendants, it was done so ineffectively given the objectively unreasonable fees paid for Retirement Plan Services.

107.    During the Class Period, and unlike a hypothetical prudent Fiduciary, Defendants did not engage in any objectively reasonable and/or prudent efforts to ensure that the Plan paid no more than a competitive reasonable fee for Retirement Plan Services.

108.    During the Class Period and because Defendants failed to regularly monitor the

Plan's retirement plan service fees paid to service providers, including but not limited to Great-West/Empower, the Plan's retirement plan service fees were significantly higher than they would have been had Defendants engaged in this process.

109.     During the Class Period and because Defendants did not regularly solicit quotes and/or competitive bids from service providers, including but not limited to Great-West/Empower, before and/or when paying fees for Retirement Plan Services, the Plan's Retirement Plan Service fees were significantly higher than they would have been had Defendants engaged in these processes. Alternatively, to the extent there was a process in place that was followed by Defendants, it was done so ineffectively given the objectively unreasonable fees paid for Retirement Plan Services.

110.     During the Class Period and because Defendants did not engage in any objectively reasonable and/or prudent efforts when paying fees for Retirement Plan Services to service providers, including but not limited to Great-West/Empower, these Retirement Plan Service fees were significantly higher than they would have been had Defendants engaged in these efforts.

111.     Regardless of whether the Retirement Plan Services and other required services are provided by a few vendors or multiple vendors, Plan Fiduciaries are required to ensure that only reasonable fees are paid by the plan.

112.     The Plan Fiduciaries understood the importance of plan fees and expenses on the ability of Plan Participants to reach their retirement savings goals.  For example, in its 2018 "Notice of Investment Returns & Fee Comparison" ("Notice"), the Plan Fiduciaries' were required to disclose to Plan Participants information about the plan noting that "[f]ees and expenses related to your plan can affect the overall long-term value of your account. The investment options you choose can also affect your account.  It is important for you to have a clear understanding of the investment

options available through your plan and the fees and expenses that are part of your plan."[1]

113.    In its Notice, the Plan Fiduciaries disclosed to Plan Participants a "description of "non-investment management fees and expenses that may be charged to your account," which included "recordkeeping, accounting, legal, consulting, or other administrative fees that may be charged to your account."

114.    The Notice disclosed that Participants would be charged an annual "Participant Account Maintenance" Fee of $101.40 "to pay for some or all of the plan's general administrative expenses which may include costs for recordkeeping, advisory, legal and accounting services."

115.    The Plan Fiduciaries Notice describes a standard bundle of Retirement Plan Services that could be provided by several other quality recordkeepers.  There is nothing contained in the Notice that describes any services that would warrant fees in excess of the fees that other Retirement Plan Service providers would provide to the Plan for materially identical services.

116.    An analysis of the Plan's 5500 forms, however, reveals an inexplicable combination of duplicative service providers receiving excessive and unreasonable fees while Plan Participants did not receive any extra value to warrant the excessive and unreasonable fees.

117.    For example, the Chart below shows all the covered service providers receiving compensation from the Plan from 2014-2019 based on the Plan's 5500 filings.  The chart illustrates that the Plan paid over $28 million in Direct Compensation during that 6-year period.  That works out to an annual average of over $180 per participant.

---

[1] The Plan Fiduciaries' Notice neither provided information that would enable Plan Participants to understand their investment options nor to understand the services they were receiving for the "Participant Account Maintenance" fee.

### Schedule C - Direct Compensation

| Provider | Relationship | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|---|
| ADVISED ASSETS GROUP, LLC | NONE | $0 | $710,885 | $805,900 | $400,694 | $488,258 | $502,557 | $2,908,294 |
| AJO, LP | NONE | $496,539 | $495,048 | $105,946 | $354,281 | $257,756 | $90,654 | $1,800,224 |
| ARROWSTREET CAPITAL, LP | NONE | $0 | $763,559 | $134,111 | $454,830 | $0 | $0 | $1,352,500 |
| CHARLES SCHWAB | INVESTMENT MANAGER | $34,757 | $0 | $0 | $0 | $0 | $0 | $34,757 |
| FRONTIER CAPITAL MANAGEMENT COMPANY | INVESTMENT ADVISOR | $1,104,572 | $1,107,838 | $753,416 | $719,430 | $590,488 | $98,263 | $4,374,007 |
| GREAT-WEST LIFE & ANNUITY INSURANCE | NONE | $2,299,182 | $3,205,317 | $2,487,630 | $1,786,370 | $1,778,252 | $590,302 | $12,147,053 |
| HEWITT ASSOCIATES LLC | NONE | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| J P MORGAN INVESTMENT MANAGEMENT IN | INVESTMENT MANAGER | $898,903 | $0 | $0 | $0 | $0 | $0 | $898,903 |
| JPMORGAN INSTITUTIONAL INVEST, INC | NONE | $39,391 | $0 | $0 | $0 | $0 | $0 | $39,391 |
| JPMORGAN SECURITIES LLC | NONE | $66,678 | $88,637 | $41,954 | $0 | $0 | $0 | $197,269 |
| LOOMIS, SAYLES & COMPANY, LP | NONE | $0 | $35,808 | $0 | $0 | $0 | $0 | $35,808 |
| LSV ASSET MAAGEMENT | INVESTMENT MANAGER | $1,378,996 | $0 | $0 | $0 | $0 | $0 | $1,378,996 |
| MERCER INVESTMENT CONSULTING INC. | NONE | $0 | $75,000 | $75,000 | $0 | $0 | $0 | $150,000 |
| QDRO CONSULTANTS | NONE | $0 | $12,000 | $7,200 | $5,100 | $0 | $0 | $24,300 |
| STATE STREET GLOBAL ADVISORS | INVESTMENT MANAGER | $58,966 | $0 | $0 | $0 | $0 | $0 | $58,966 |
| WELLS CAPITAL MANAGEMENT | NONE | $0 | $112,160 | $204,546 | $0 | $0 | $0 | $316,706 |
| WINSLOW CAPITAL MGMT, LLC | NONE | $857,381 | $933,972 | $749,226 | $0 | $0 | $0 | $2,540,579 |
| Total Schedule C Direct Compensation | | $7,235,365 | $7,540,224 | $5,364,929 | $3,720,705 | $3,114,754 | $1,281,776 | $28,257,753 |

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| Participants | 41,651 | 43,115 | 16,966 | 17,484 | 17,271 | 17,349 |
| Total Schedule C Direct Compensation / pp | $174 | $175 | $316 | $213 | $180 | $74 |

118.     As set forth below, an effective rate of $180 per participant is excessive and unreasonable for the Retirement Plan Services received by the Plan.

119.     An evaluation and analysis of the 2018 5500 filings of plans with similar numbers of participants enables a determination of a reasonable fee that could have been obtained by a prudent plan fiduciary for a materially similar bundle of services from other quality retirement plan service providers.

120.     The Plan's Participant Fee Disclosure Notices establish that the fees Plan Participants paid through the "Participant Account Maintenance" fee was the absolute minimum

amount Plan Participants actually paid for "Retirement Plan Services," and that amount is set forth in the chart below.

121.    Notably, based on the Plan's Participant Fee Disclosure documents, the Retirement Plan Service Fees set forth above *do not include* the following fees charged by Great West/Empower and other covered service providers: 1) Loan Origination fees; 2) Domestic Relations Order Fees; 3) Brokerage Fees; and 4) Wire Special Handling Charges, among other immaterial fees charged separately to individual participants.  Managed Account fees charged by the Advised Asset Group (a managed account service affiliate of Great West/Empower) are also *not included* in the Retirement Plan Service Fees set forth above.

122.    When determining the Retirement Plan Service fees paid by comparable plans, revenues from loan fees, Domestic Relations Order fees, Brokerage Fees, if any, and other similar fees *were included*.  For the comparable plan fees, all direct compensation to all covered service providers was included except any managed account/participant advice fees.  Additionally, any revenue sharing related to the investments in the comparable plans was also included unless the 5500 forms and accompanying financial statements and the Notes thereto made it clear that the revenue sharing was returned to participants.  In this way, the comparisons set forth below tend to *overstate* the Retirement Plan Service fees of the comparable plans and *understate* the Retirement Plan Service fees of the Plan.

123.    Despite the methodology utilized being favorable to Defendants, the Plan's effective fee rate per participant was more than double the fee rate of the comparable plans. This leads to an inference that the Plan Fiduciaries were imprudent in how they structured the delivery of Retirement Plan Services to their Participants.

124.    From the years 2014 through 2019 and based upon the best publicly available

information, which was equally or even more easily available to Defendants during the Class Period, the table below shows the actual year-end participants and annual retirement plan service fees illustrating that the Plan had on average 25,639 participants and paid an average effective annual retirement plan service fee (participant account maintenance fee) of at least approximately $1,980,666, which equates to an average of at least approximately $77 per participant.

125.    As can be seen from the table below, during 2014 and 2015 the Plan had more than twice as many Participants as compared to 2016-2019. That is because in October 2016 the Plan's sponsor, R.R. Donnelley & Sons Company, completed its spin-offs of its publishing and retail print services and office products businesses. These spin-offs resulted in a number of plan Participants and their assets becoming participants in two new plans.

| Retirement Plan Services (RPS) Fees | | | | | | |
|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Average |
| Participants | 41,651 | 43,115 | 16,966 | 17,484 | 17,271 | 17,349 | 25,639 |
| Est. RPS Fees | $2,808,943 | $2,907,676 | $1,144,187 | $1,775,615 | $1,752,699 | $1,494,876 | $1,980,666 |
| Est. RPS Per Participant | $67 | $67 | $67 | $102 | $101 | $86 | $77 |

126.    As a result, in 2015 the Plan was relatively larger having more participants than 99.98% of plans and more assets than 99.96% of plans thereby having substantial leverage to negotiate reasonable fees. As noted above, however, even after the corporate spin-offs, the Plan was still in the top 1% of plans in terms of both assets and participants giving it substantial leverage.

127.    Prior to the corporate spin-offs, from the years 2014 through 2015 and based upon information derived publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to Defendants during the Class Period, the table below illustrates the annual retirement plan service fees paid by other comparable Plans with a similar number of participants and a similar amount of plan assets,

compared to the average annual retirement plan service fees paid by the Plan during 2014 and 2015.

128.     The fees paid by the comparable plans in the table below are derived from publicly available information reported in 5500 forms and the accompanying financial statements that are required to be filed with the Department of Labor each year. An analysis of these documents allows for a determination of the direct and indirect compensation received by the retirement plan service providers.

**Comparable Plans' RPS Fees Based on Publicly Available Information from Form 5500**

| Plan | Participants | Assets | RPS Fee | RPS Fee /pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| Philips North America 401(K) Plan | 29,070 | $4,129,162,920 | $1,158,423 | $40 | Vanguard | White |
| Kindred 401(k) | 34,092 | $1,299,328,331 | $1,196,564 | $35 | T. Rowe Price | White |
| Deseret 401(K) Plan | 34,357 | $3,381,868,127 | $873,028 | $25 | Great-West | White |
| Thermo Fisher Scientific Inc. 401(K) Retirement Plan | 35,739 | $4,320,623,419 | $713,758 | $20 | T. Rowe Price | White |
| Tesla, Inc. 401(K) Plan | 39,720 | $448,783,109 | $1,178,160 | $30 | Fidelity | White |
| Publicis Benefits Connection 401K Plan | 42,316 | $2,547,763,175 | $1,547,849 | $37 | Fidelity | White |
| **RR Donnelley Savings Plan Average Fee** | **42,383** | **$2,621,877,431** | **$2,858,310** | **$67** | **Great-West** | **Red** |
| Caesars Entertainment Corporation Savings & Retirement Plan | 43,066 | $1,407,019,418 | $1,690,906 | $39 | Alight | White |
| Advocate Health Care Network Retirement Savings Plan 401(K) | 44,893 | $2,954,809,557 | $1,421,458 | $32 | Alight | White |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 47,358 | $3,104,524,321 | $1,310,600 | $28 | Vanguard | White |

129.     Prior to the corporate spin-offs, from the years 2014 through 2015 and based upon information derived from publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to

Defendants during the Class Period, the graph below illustrates the annual retirement plan service fees paid by other comparable Plans with a similar number of participants and a similar amount of plan assets receiving a similar level and quality of services, compared to the average annual retirement plan service fees paid by the Plan (as identified in the table above), with the white data points representing retirement plan service fees that retirement plan providers offered to (and were accepted by) comparable Plans.



130.   Prior to the corporate spin-offs, from the years 2014 to 2015 and based upon information derived from publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrates that the Plan paid an

effective average annual retirement plan service fee of at least $67 per participant for Retirement Plan Services.

131.     Prior to the corporate spin-offs, from the years 2014 through 2015 and based upon information derived from publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrate that a hypothetical prudent plan Fiduciary would have paid on average an effective annual retirement plan service fee of around $31 per participant, if not lower.

132.     After the corporate spin-offs, from the years 2016 through 2019 and based upon information derived from 408(b)(2) plan sponsor disclosures, 404(a)(5) participant fee disclosures, and publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to Defendants during the Class Period, the table below illustrates the annual Retirement Plan Service fees paid by other comparable Plans with a similar number of participants and a similar amount of plan assets receiving a similar level and quality of services, compared to the average annual retirement service plan fees paid by the Plan from 2016 through 2019.

133.     The fees paid by the comparable plans in the table below are derived from 408(b)(2) plan sponsor disclosures, 404(a)(5) participant fee disclosures, and publicly available information reported on 5500 forms and the accompanying financial statements. An analysis of these documents allows for a determination of the direct and indirect compensation received by the retirement plan service providers. Costs related to testing, participant communications, and other standard services provided by the retirement plan service provider are all immaterial. Plans of the

size of the RR Donnelley Plans receive all of these services included with no additional fees.

**Comparable Plans' RPS Fees Based on Publicly Available Information from Form 5500**

| Plan | Participants | Assets | RPS Fee | RPS Fee /pp | Recordkeeper | Graph Color |
|------|------|------|------|------|------|------|
| Vibra Healthcare Retirement Plan | 9,750 | $107,652,510 | $341,597 | $35 | Great-West | White |
| Republic National 401(K) Plan | 9,922 | $671,989,837 | $442,799 | $45 | Great-West | White |
| Southern California Permanente Medical Group Tax Savings Retirement Plan | 10,770 | $773,795,904 | $333,038 | $31 | Vanguard | White |
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $460,727 | $35 | Fidelity | White |
| Dollar General Corp 401(k) Savings and Retirement Plan | 16,125 | $355,768,325 | $635,857 | $39 | Voya | White |
| Michelin 401(K) Savings Plan | 16,521 | $2,391,639,166 | $570,186 | $35 | Vanguard | White |
| **RR Donnelley Savings Plan Average Fee** | **17,268** | **$1,186,143,133** | **$1,541,844** | **$89** | **Great-West** | **Red** |
| Sedgwick 401(K) Savings Plan | 17,459 | $801,477,209 | $823,802 | $47 | Merrill Lynch | White |
| Fedex Office And Print Services, Inc. 401(K) Retirement Savings Plan | 17,652 | $770,290,165 | $521,754 | $30 | Vanguard | White |
| Pilgrim's Pride Retirement Savings Plan | 18,356 | $321,945,688 | $457,500 | $25 | Great-West | White |
| JBS 401(K) Savings Plan | 19,420 | $374,330,167 | $539,206 | $28 | Great-West | White |

133.    After the corporate spin-offs, from the years 2016 through 2019 and based upon information derived from 408(b)(2) plan sponsor disclosures, 404(a)(5) participant fee disclosures, and publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to Defendants during the Class Period, the graph below illustrates the annual retirement plan service fees (participant account maintenance service fees) paid by other comparable Plans with a similar number of participants and a similar amount of plan assets receiving a similar level and quality of services, compared to the average annual retirement plan service fees paid by the Plan (as identified in the table above),

with the white data points representing retirement plan service fees that retirement plan providers offered to (and were accepted by) comparable Plans.



134.    After the corporate spin-offs, from the years 2016 to 2019 and based upon information derived from 408(b)(2) plan sponsor disclosures, 404(a)(5) participant fee disclosures, and publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrates that the Plan paid an effective average annual retirement plan service fees paid of $89 per participant for Retirement Plan Services.

135.    After the corporate spin-offs, from the years 2016 through 2019 and based upon information derived from 408(b)(2) plan sponsor disclosures, 404(a)(5) participant fee disclosures, and publicly available information reported on 5500 forms and the accompanying financial

statements, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrate that a hypothetical prudent plan Fiduciary would have paid on average an effective annual retirement plan service fee of around $33 per participant, if not lower.

136. From the years 2014 through 2019 and based upon information derived from 408(b)(2) plan sponsor disclosures, 404(a)(5) participant fee disclosures, and publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other Plans of similar sizes with similar amounts of money under management and with similar level and quality of services, had Defendants been acting in the exclusive best interest of the Plan's Participants the Plan actually would have paid significantly less than an average of approximately $1,980,666 per year in retirement plan service fees, which equated to an effective average of approximately $77 per participant per year.

137. From the years 2014 through 2019 and based upon information derived from 408(b)(2) plan sponsor disclosures, 404(a)(5) participant fee disclosures, and publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other Plans of similar sizes with similar amounts of money under management and with similar level and quality of services, had Defendants been acting in the best interests of the Plan's Participants, the Plan actually would have paid on average a reasonable effective annual market rate for Retirement Plan Services of approximately $817,843 per year in retirement plan service fees, which equates to approximately $32 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan Fiduciary would not agree to pay more than double what they could otherwise pay for materially the same level and quality of retirement plan retirement

services.

138.     From the years 2014 through 2019 and based upon information derived from 408(b)(2) plan sponsor disclosures, 404(a)(5) participant fee disclosures, and publicly available information reported on 5500 forms and the accompanying financial statements which was equally or even more easily available to Defendants during the Class Period, the Plan additionally cost its Participants on average approximately $1,162,823 per year in retirement plan service fees, which equates to on average approximately $45 per participant per year.

139.     From the years 2014 to 2019, and because Defendants did not act in the best interests of the Plan's Participants, and as compared to other Plans of similar sizes with similar amounts of money under management and with similar level and quality of services, the Plan actually cost its Participants a total minimum amount of approximately $6,976,940 in unreasonable and excessive retirement plan service fees.

140.     From the years 2014 to 2019 based upon information derived from 408(b)(2) plan sponsor disclosures, 404(a)(5) participant fee disclosures, and publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to Defendants during the Class Period, because Defendants did not act in the best interests of the Plan's Participants, and as compared to other Plans of similar sizes with similar amounts of money under management and with similar level and quality of services, the Plan actually cost its Participants (when accounting for compounding percentages) a total, cumulative amount in excess of $10,209,069 in retirement plan service fees.

141.     During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not regularly and/or reasonably assess the Plan's retirement plan service fees.

142.     During the entirety of the Class Period, and unlike a hypothetical prudent Fiduciary,

Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the retirement plan service fees it paid to Great-West/Empower vis-à-vis the fees that other retirement plan service providers would charge for the same level and quality of services.

143.     During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's retirement plan service fees it paid to Great-West/Empower, but Defendants simply failed to do so.

144.     During the entirety of the Class Period and had Defendants engaged in any regular and/or reasonable examination and competitive comparison of the retirement plan service fees it paid to Great-West/Empower, it would have realized and understood that the Plan was objectively compensating Great-West/Empower unreasonably and inappropriately for its size, scale, and level and quality of services, passing these objectively unreasonable and excessive fee burdens to Plaintiff and the Plan Participants.

145.     The retirement plan service fees charged to the Plan by Great-West/Empower were excessive relative to the level and quality of the Retirement Plan Services received by the Plan. Other covered service providers, and Great-West/Empower itself, would have, and did, accept lower fees for the exact same bundle of Retirement Plan Services.

146.     The Plan's fees were therefore not justified by the services provided when considering the "plan as a whole," *Renfro v. Unisys Corp.*, 671 F.3d 314, 327 (3d Cir. 2011), and there were "hypothetical lower-cost covered service provider[s that] would have performed at the level necessary to serve the best interests of the" Plan's Participants. *Divane v. Northwestern Univ.,* 953 F.3d 980, 991 (7th Cir. 2020).

147.     The Plan has a large pool of participants and assets, the retirement plan service

market is highly competitive, and Defendants paid higher than reasonable retirement plan service fees despite their market strength.

148.     During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher retirement plan service fees than they should have been and/or by failing to take effective remedial actions as described herein, Defendants breached their fiduciary duties of prudence and loyalty to Plaintiff and the Plan Participants.

### THE PLAN'S FIDUCIARIES DID NOT EFFECTIVELY MONITOR MANAGED ACCOUNT SERVICE FEES AND, AS A RESULT, THE PLAN PAID UNREASONABLE MANAGED ACCOUNT SERVICE FEES

149.     Since at least 2014, Defendants have retained Great-West/Empower's subsidiary Advised Assets Group, LLC ("AAG") (also referred to as "Empower Retirement Advisory Services Professional Management Program") to provide managed account services to the Plan.

150.     According to Defendants' Participant Fee Disclosure documents, AAG purported to provide participants with an asset allocation mix of funds available within the Plan.

151.     Plaintiff was charged between 55 and 60 basis points on an annual basis for using AAG.

152.     For this service, up through the end of 2018, Defendants required participants to pay an annual fee of at least 0.60% on the first $100,000, 0.45% on the next $150,000, and 0.30% on assets greater than $250,000.

153.     For this service, up through the end of 2020, Defendants required participants to pay an annual fee of at least 0.55% on the first $100,000, 0.45% on the next $150,000, and 0.30% on assets greater than $250,000.

154.     Upon information and belief, the table below illustrates the fee rates paid by similarly situated plans for virtually and materially identical managed account services.

| Managed Account service fee rates of other large defined contribution plans | Fee on 1st Tier | Fee on 2nd Tier | Fee on 3rd Tier |
|---|---|---|---|
| RR Donnelley - Empower's "Retirement Advisory Services Professional Management Program" service (2017-2018) | 0.60% | 0.45% | 0.30% |
| AGFA Healthcare Corp. Employee Savings Plan (2018) | 0.40% | 0.30% | 0.20% |
| Caterpillar Sponsored 401(k) Plans (2016) | 0.40% | 0.30% | 0.20% |
| Citi Ret. Savings Plan (2015) | 0.35% | 0.30% | 0.25% |
| JC Penney 401(k) Savings Plan (2015) | 0.35% | 0.25% | 0.10% |
| Comcast Corp. Ret. Investment Plan (2019) | 0.00% | 0.30% | 0.20% |

155.     As illustrated above, Plaintiff and Plan Participants are paying fee rates greater than participants in similarly situated plans (see portions of the table highlighted in red).

156.     Furthermore, there are a number of other managed account providers whose services are virtually identical to the services provided to Plan Participants through AAG and whose fees range from 0.25% to 0.30% on all assets, e.g., Betterment, Vanguard, and Charles Schwab, for plans much smaller than the Plan.

157.     As a result, it is clear that the fee rates paid by Plaintiff and Plan Participants for the AAG Managed Account Services were excessive and not reasonable given the Plan's size and negotiating power.

158.     The Plan's managed account services added no material value to Plaintiff or to Participants to warrant any additional fees. The asset allocations created by the managed account services were not materially different than the asset allocations provided by the age-appropriate target date options ubiquitously available to Defendants in the market.

159.     It is undisputed in the retirement plan industry that offering asset allocation solutions to plan participants in the form of target date funds is a best practice.

160.     Moreover, the purpose of all the managed account services selected and made available by Defendants to Plan Participants is identical, i.e., to provide an automated time-based

dynamic asset allocation creation and rebalancing solution that reallocates the asset allocation over time as circumstances change.

161.    As a result, based on the value provided, the reasonable fee for Plan's managed account service was zero or very close to zero.

162.    A prudent fiduciary would have conducted periodic cost benchmarking and taken other measures (including issuing an RFP, if necessary), as well as evaluating the incremental value provided to Plan Participants, to ensure that the amounts paid by the Plan for managed account services were reasonable. Had Defendants done so, the Plan would not have paid the excessive managed account service fees that it did.

163.    Based on the excessive amounts paid by the Plan for managed account services, it is reasonable to infer that Defendants failed to prudently monitor and manage the Plan's managed account services.

164.    Defendants' failure to properly monitor or control fees for the Plan's managed account service cost resulted in Plan participants paying excessive and unreasonable fees and constitutes a separate and independent breach of the fiduciary duties of prudence and loyalty.

165.    The AAG Managed account service was offered by Great-West/Empower to increase the revenue they generated through their relationship with the Plan.

166.    Great-West/Empower promoted the AAG managed account service over other potential managed account solutions because Great West/Empower earned more revenue when Plan Participants, like Plaintiff, used the AAG Managed Account services.

167.    By failing to understand and eliminate the conflict-of-interest and the self-dealing engaged in by Great-West/Empower with its subsidiary, AAG , and thereby reduce Plan fees and

costs to a reasonable level, Defendants separately violated their duties of prudence and loyalty to Plan Participants.

## FAILURE TO FULLY DISCLOSE FEES CHARGED OR CREDITED TO THE PLAN INVESTMENTS

168.    ERISA imposes a duty on plan administrators to provide to plan participants on a "regular and periodic basis . . . sufficient information regarding the plan, including fees and expenses, and regarding designated investment alternatives, including fees and expenses attendant thereto, to make informed decisions with regard to the management of their individual accounts." 29 C.F.R. §2550-404a-5(a).

169.    In order to satisfy this requirement, a plan administrator must provide (among other things) (1) an "identification of any designated investment managers," (2) "an explanation of any fees and expenses that may be charged against the individual account of a participant or beneficiary … not reflected in the total annual operation expenses of any designated investment alternatives," and (3) "at least quarterly, a statement" reflecting the dollar amount and nature of those expenses "actually charged," along with a "description of the services to which the charges relate." 29 C.F.R. §2550- 404a-5(b)-(d).

170.    Defendants failed to adequately explain the "Participant Account Maintenance" fee charged to Participants in the Plan.

171.    More specifically, the participant fee disclosure documents do not enable a Plan Participant to understand all the services provided in exchange for the "Participant Account Maintenance" fee.  A reasonable reading of the participant fee disclosure documents would lead a participant to believe that Great West/Empower was receiving the vast majority of the "Participant Account Maintenance" fees. Even by reviewing quarterly statements, the Plan's 5500 Forms, and the 404a-5 participant fee disclosures, it is unclear who is getting paid what for what services, the

method of the payment, and if the service is being paid by RR Donnelley or by the Plan (Participant).

172.  Moreover, in at least one year of the Class Period, the Plan Fiduciaries required Plan Participants to pay at least $400,000 more than was required by the Retirement Plan Services providers to deliver the services to the Plan.  Then, instead of returning those excess fees to Plan Participants, which would be the conduct of a Plan Fiduciary acting in the best and exclusive interest of Plan Participants, the Plan Fiduciaries maintained those assets as "Unallocated Plan Assets," basically a slush fund for at least four years of the Class Period.  The Plan Fiduciaries' decision to refuse to return the excess fees to Plan Participants was not in the exclusive interest of Plan Participants.

173.  Additionally, on their face, at least four of the Participant Fee Disclosure Documents do not even provide basic information about the investment options made available to Plan such as the goals, investment strategies, investment managers, and risk profile of each investment option.

174.  The Defendants' incomplete and inadequate disclosures are a clear violation of ERISA disclosure requirements imposed on all plan administrators and are also evidence that the Defendants were imprudent in the administration of the Plan.

175.  The failure to disclose all the information a Participant would need to make an informed investment decision, as required under 29 C.F.R. §2550-404a-5(a), breached the fiduciary obligations of prudence and loyalty that Defendants owed to Plaintiffs and members of the Class.

176.  Plan Participants have been damaged in the form of unknowingly paying higher fees for Retirement Plan Services through Defendants' incomplete and erroneous disclosures.

## **CLASS ACTION ALLEGATIONS**

177.    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring

an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan

under 29 U.S.C. §1109(a).

178.    In acting in this representative capacity, Plaintiff seeks to certify this action as a

class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and

to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the RR Donnelley Savings Plan
> beginning six (6) years before the commencement of this action and
> running through the date of judgment, excluding the Defendants or
> any participant/beneficiary who is a fiduciary to the Plan.

179.    The Class includes on average more than 25,000 members and is so large that

joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

180.    There are questions of law and fact common to this Class pursuant to Federal Rule

of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the

actions and omissions alleged as the Plan and not as to any individual participant. Common

questions of law and fact include but are not limited to the following:

- Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

- Whether Defendants breached their fiduciary duties to the Plan;

- What are the losses to the Plan resulting from each breach of fiduciary duty; and

- What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

181.    Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a participant during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

182.    Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they are participants in the Plan during the Class period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

183.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

184.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

185.    Plaintiff's attorney is experienced in complex ERISA and class litigation and will adequately represent the Class.

186.    The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts. The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in individual participants' Plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

187.    Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

188.    Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

**FIRST CLAIM FOR RELIEF**
**Breaches of Duties of Loyalty and Prudence of ERISA, as Amended**
**<u>(Plaintiff, on behalf of himself & Class against Defendants– Retirement Plan Service Fees)</u>**

189.    Plaintiff restates the above allegations as if fully set forth herein.

190.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§1002(21) and/or 1102(a)(1).

191.    29 U.S.C. §1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan.

192.     Defendants, as fiduciaries of the Plan, are responsible for selecting service providers that charge reasonable Retirement Plan Service fees.

193.     During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's Retirement Plan Service fees were reasonable; manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

194.     During the Class Period, Defendants breached their fiduciary duties of prudence and loyalty to Plan Participants, including Plaintiff, by failing to: ensure that the Plan's Retirement Plan Service fees were reasonable, properly disclose the fees charged to Participants in the Plan in their quarterly statements or fee disclosures, manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

195.     During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's service providers to make sure they were providing the contracted services at reasonable costs, given the highly competitive market for Retirement Plan Services and the significant bargaining power the Plan had to negotiate reasonable fees.

196.     During the Class Period, Defendants breached their duty to Plan Participants, including Plaintiff, by failing to employ a prudent and loyal process by failing to critically or objectively evaluate the cost and performance of the Plan's service providers in comparison to other Retirement Plan Service providers providing materially identical services at a materially similar quality.

197.    Through these actions and omissions, Defendants breached their fiduciary duties of loyalty with respect to the Plan in violation 29 U.S.C. §1104(a)(1)(A) by failing to act in the best interest of Plan Participants.

198.    Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. §1104(a)(1)(B).

199.    As a result of Defendants' breach of fiduciary duties of prudence and loyalty with respect to the Plan, the Plaintiff and Plan Participants suffered objectively unreasonable and unnecessary monetary losses, amounting to millions of dollars.

200.    Defendants are liable under 29 U.S.C. §§1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2).

**SECOND CLAIM FOR RELIEF**
**Breaches of Duties of Loyalty and Prudence of ERISA, as Amended**
**(Plaintiff, on behalf of himself & Class against Defendants – Managed Account Service Fees)**

201.    Plaintiff restates the above allegations as if fully set forth herein.

202.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§1002(21) and/or 1102(a)(1).

203.    29 U.S.C. §1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan.

204.    Defendants, as fiduciaries of the Plan, are responsible for selecting a managed account service provider that charges reasonable managed account service fees.

205.    During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's managed account service fees were reasonable; manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

206.    During the Class Period, among other things, Defendants imprudently caused the Plan to pay excessive managed account service fees and failed to properly monitor and control those expenses. Each of the actions and omissions described above and elsewhere in this Complaint demonstrate that Defendants failed to defray reasonable expenses of the Plan, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of their fiduciary.

207.    During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's managed account providers to make sure they were providing the contracted services at reasonable costs, given the highly competitive market surrounding managed account services and the significant bargaining power the Plan had to negotiate the best fees.

208.    During the Class Period, Defendants breached their duty to Plan Participants, including Plaintiff, by failing to employ a prudent and loyal process by failing to critically or objectively evaluate the cost and performance of the Plan's managed account providers in comparison to other managed account options.

209. Through these actions and omissions, Defendants breached their fiduciary duty of loyalty with respect to the Plan in violation 29 U.S.C. §1104(a)(1)(A), by not acting in the best interests of Plan Participants.

210. Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. §1104(a)(1)(B).

211. As a result of Defendants' breach of fiduciary duty of prudence and loyalty with respect to the Plan, the Plaintiff and Plan Participants suffered objectively unreasonable and unnecessary monetary losses, amounting to millions of dollars.

212. Defendants are liable under 29 U.S.C. §§1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2).

### THIRD CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class against Defendants RR Donnelley and Board – Retirement Plan Service Fees)**

213. Plaintiff restates the above allegations as if fully set forth herein.

214. RR Donnelley, through its Board, had the authority to appoint and remove at least some members or individuals responsible for Plan Retirement Plan Service fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

215. In light of this authority, RR Donnelley, through its Board, had a duty to monitor those individuals responsible for Plan Retirement Plan Service fees to ensure that they were

adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

216.   RR Donnelley, through its Board, had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to RR Donnelley.

217.   The excessive Retirement Plan Service fees paid by the Plan inferentially suggest that RR Donnelley and the Board breached their duty to monitor the individuals they appointed to the Benefit Committee, by, among other things:

a.   Failing to monitor and evaluate the performance of individuals responsible for Plan Retirement Plan Service fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high Retirement Plan Service expenses;

b.   Failing to monitor the process by which Plan service providers were evaluated and failing to investigate the availability of lower-cost service providers; and

c.   Failing to remove individuals responsible for Plan Retirement Plan Service fees whose performance was inadequate in that these individuals continued to pay the same Retirement Plan Service costs even though benchmarking and using other similar comparators would have showed that maintaining Great-West/Empower as a service provider was imprudent, excessively costly, all to the detriment of the Plan and Plan Participants' retirement savings.

218.    As the consequences of the foregoing breaches of the duty to monitor Retirement Plan Service fees, the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses, amounting to millions of dollars.

219.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), RR Donnelley is liable to restore to the Plan all loses caused by its failure to adequately monitor individuals responsible for Plan Retirement Plan Service fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**FOURTH CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class against Defendants RR Donnelley and Board –**
**Managed Account Service Fees)**

220.    Plaintiff restates the above allegations as if fully set forth herein.

221.    RR Donnelley, through its Board, had the authority to appoint and remove some of the members or individuals responsible for Plan managed account service fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

222.    In light of this authority, RR Donnelley, through its Board, had a duty to monitor those individuals responsible for Plan managed account service fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

223.    RR Donnelley, through its Board, had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to RR Donnelley.

224.    The excessive managed account fees paid by the Plan inferentially suggest that RR Donnelley and the Board breached their duty to monitor the individuals they appointed to the Benefit Committee, by, among other things:

a.    Failing to monitor and evaluate the performance of individuals responsible for Plan managed account service fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high managed account service expenses;

b.    Failing to monitor the process by which Plan managed account providers were evaluated and failing to investigate the availability of lower-cost managed account providers; and

c.    Failing to remove individuals responsible for Plan managed account service fees whose performance was inadequate in that these individuals continued to pay the same managed account service costs even though benchmarking and using other similar comparators would have showed that maintaining their managed account providers was imprudent, excessively costly, all to the detriment of the Plan and Plan Participants' retirement savings.

225.    As the consequences of the foregoing breaches of the duty to monitor for managed account service fees, the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses, amounting to millions of dollars.

226.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), RR Donnelley is liable to restore to the Plan all loses caused by its failure to adequately monitor individuals responsible for Plan managed account service fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.    A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying excessive Retirement Plan Service fees and managed account service fees, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An Order requiring Defendant RR Donnelley to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. §1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against RR Donnelley as necessary to effectuate relief, and to prevent RR Donnelley' unjust enrichment;

F.    An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan Fiduciaries deemed to have breached their fiduciary duties;

H.    An award of pre-judgment interest;

I.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.    Such other and further relief as the Court deems equitable and just.

Dated this 24th day of February, 2021.

WALCHESKE & LUZI, LLC
Counsel for Plaintiff

s/ **_Paul M. Secunda_**
James A. Walcheske, WI State Bar No. 1065635
Paul M. Secunda, WI State Bar No. 1074127

WALCHESKE & LUZI, LLC
125 South Wacker Drive, Suite 300
Chicago, Illinois 60606
Telephone: (262) 780-1953
Fax: (262) 565-6469
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com