UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---

MICHAEL W. TOLOMEO, SERAFIN
CHAVEZ, and DONALD A. LAFRENIERE,
individually, and as representatives of a Class
of Participants and Beneficiaries of the RR
Donnelley Savings Plan,

Plaintiffs,

v.

R.R. DONNELLEY & SONS, INC.

and

THE BOARD OF DIRECTORS OF
R.R. DONNELLEY & SONS, INC.

and

THE BENEFITS COMMITTEE OF
R.R. DONNELLEY & SONS, INC.,

Defendants

Case No. 1:20-cv-7158

**CLASS ACTION SECOND
AMENDED COMPLAINT FOR
CLAIMS UNDER 29 U.S.C.
§ 1132(a)(2)**

---

## SECOND AMENDED COMPLAINT

COMES NOW Plaintiffs, Michael W. Tolomeo, Serafin Chavez, and Donald A. Lafreniere,

individually and as representatives of a Class of Participants and Beneficiaries on behalf of

the RR Donnelley Savings Plan (the "Plan"), by their counsel, WALCHESKE & LUZI, LLC,

as and for a claim against Defendants, alleges and asserts to the best of their knowledge,

information, and belief, formed after an inquiry reasonable under the circumstances, the

following:

## INTRODUCTION

1.       The essential remedial purpose of the Employee Retirement Income Security Act ("ERISA") is "to protect the beneficiaries of private pension plans." *Nachwalter v. Christie*, 805 F.2d 956, 962 (11th Cir. 1986).

2.       The law is settled under ERISA that, "a categorical rule is inconsistent with the context-specific inquiry that ERISA requires," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739 (2022), and "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* (*citing Tibble v. Edison Int'l*, 575 U.S. 523 (2015).)

3.       Even in a defined contribution plan in which participants are responsible for selecting their plan investments, ERISA Section 404(c), 29 U.S.C. § 1104(c), "plan fiduciaries are required to conduct *their own independent evaluation* to determine which investments may be prudently included in the plan's menu of options." *See Hughes*, 142 S. Ct. at 742 (*citing Tibble*, 575 U.S. at 529–530) (emphasis added.) "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time," fiduciaries "breach their duty [of prudence]." *Id.*

4.       Defendants R.R. Donnelley & Sons, Co. ("RR Donnelley"), the Board of Directors of R.R. Donnelley & Sons, Co. ("Board Defendants"), and the Benefits Committee of R.R. Donnelley & Sons, Co. ("Committee Defendants") (collectively, "Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 401(k) defined contribution pension plan – known as the RR Donnelley Savings Plan ("The Plan") – that they sponsor and provide to its employees.

5.       Plaintiff alleges that during the putative Class Period (December 3, 2014 through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA, 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiff,

and to the other participants of the Plan by, among other things: (1) authorizing the Plan to pay unreasonably high fees for Retirement Plan Services ("RPS") (including Participant Account Maintenance fees); (2) authorizing the Plan to pay unreasonably high fees for managed account services; and (3) failing to disclose to Plan Participants fees associated with the Plan.

6.     These objectively unreasonable Retirement Plan Services fees and managed account fees cannot be justified. Defendants' failures breached the fiduciary duties they owed to Plaintiffs, Plan Participants, and beneficiaries. Prudent fiduciaries of 401(k) Plans continuously monitor fees against applicable benchmarks and peer groups to identify objectively unreasonable and unjustifiable fees. Defendants did not engage in a prudent decision-making process, as there is no other explanation for why the Plan paid these objectively unreasonable fees for recordkeeping/RPS and managed account services.

7.     These objectively unreasonable recordkeeping and investment fees cannot be contextually justified, and do not fall within "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *See Hughes*, 142 S. Ct. at 742.

8.     Defendants breached their fiduciary duty of prudence by causing Plaintiffs and other Plan participants to pay excessive recordkeeping/RPS and managed account fees.

9.     Defendants unreasonably failed to leverage the size of the Plan to pay reasonable fees for Plan recordkeeping/RPS and managed account services.

10.     ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating recordkeeping/RPS, and managed account fees, based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

11.     There is no requirement to allege the actual inappropriate fiduciary actions taken because "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which he has no access, as long as the facts alleged tell a plausible story." *Allen v.*

*GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016.)

12. The unreasonable recordkeeping/RPS and managed account fees paid inferentially tells the plausible story that Defendants breached their fiduciary duty of prudence under ERISA.

13. These breaches of fiduciary duty caused Plaintiffs and Class Members millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees and expenses.

14. To remedy these fiduciary breaches, Plaintiffs bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. §1331 and pursuant to 29 U.S.C. §1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. §1001 et seq.

16. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

17. Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within the District.

18. In conformity with 29 U.S.C. §1132(h), Plaintiff served the initial Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

19.     Plaintiff Michael A. Tolomeo is a resident of the State of Illinois and currently resides in LaGrange Highlands, Illinois, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

20.     Plaintiff Tolomeo was an Operations Manager, Branch Manager, and Regional Manager, at the Aurora, Illinois facility, from 2014 through 2019. During the Class Period, he was invested in the Target Date 2025 Fund.

21.     Plaintiff Serafin Chavez is a resident of the State of Illinois and currently resides in Bartlett, Illinois, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

22.     Plaintiff Chavez was an IT Asset Administrator at both the Bannockburn and Warrenville, Illinois facilities, from October 2006 through September 2017. During the Class Period, he was invested in the following Plan investments: Target Date 2025 Fund, International Equity Fund, and U.S. Small/Mid Cap Equity.

23.     Plaintiff Donald A. Lafreniere is a resident of the State of Wisconsin and currently resides in Appleton, Wisconsin, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

24.     Plaintiff Lafreniere worked in the Maintenance Department in the Menasha, Wisconsin, facility from 2014 through 2017.  During the Class Period, he was invested in the following Plan investments: US Intermediate Bond Index, US Large Cap Equity Index, International Equity Index, and U.S. Small/Mid Cap Equity Index.

25.     Plaintiff Lafreniere paid managed account service fees to Advised Asset Group ("AAG") and Financial Engines to provide managed account services to him through the Plan.

26.     Plaintiffs have Article III standing to bring this action on behalf of the Plan because they suffered actual injuries to their own Plan accounts as a result of excessive recordkeeping/RSP and managed account fees, that injury is fairly traceable to Defendants' unlawful conduct in maintaining Great-West Life & Annuity Insurance d/b/a Empower Retirement ("Empower") as their recordkeeper and Financial Engines as their managed account service provider, and that harm is likely to be redressed by a favorable judgment.

27.     Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond his own injuries.

28.     The Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive recordkeeping and managed account fees) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

29.     Having never managed a mega 401(k) Plan, meaning a plan with over $500 million dollars in assets, *see Center for Retirement and Policy Studies, Retirement Plan Landscape Report* 18 (March 2022) ("Mega plans have more than $500 million in assets,") Plaintiffs, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

30.     R.R. Donnelley & Sons, Co. ("RR Donnelley") is a company with its principal headquarters located at 35 W. Wacker Dr., Chicago, IL 60601. In this Amended Complaint, "RR Donnelley" refers to the named defendant and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain. RR Donnelley is a leading global provider of multichannel business communications services and marketing solutions. With more than 35,000 employees across 29 countries, RR Donnelley offers solutions designed to help companies optimize customer engagement and streamline

business operations.

31.     The Plan Administrator of the RR Donnelley Savings Plan is the Benefits Committee of R.R. Donnelley & Sons, Co., located at 35 W. Wacker Drive, Chicago, IL 60601. The Plan states that at least two individuals become members of the Benefit Committee by virtue of either being the company's Treasurer or Vice President. (*RR Donnelley Plan Document* at Arts. §§ 12.1, 12.1(a)(4))

32.     Because RR Donnelley, through its Board of Directors, hires its Treasurer and Vice President, RR Donnelley and its Board also consequently appoints these same individuals, by operation of the Plan, to be members of the Benefits Committee. Thus, RR Donnelley and its Board have a fiduciary duty to monitor their appointees to the Benefits Committee.

33.     As the Plan Administrator, the Benefits Committee is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). It has authority and responsibility for the control, management, and administration of the Plan in accordance with 29 U.S.C. § 1102(a). The Benefits Committee has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

34.     RR Donnelley acted through its officers, including the Board Defendants, Committee Defendants, and their members, to perform Plan-related fiduciary functions in the course and scope of their business. For these reasons, RR Donnelley, the Board Defendants, and the Benefits Committee, are all fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

35.     To the extent that there are additional officers and employees of RR Donnelley who are/were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of whom

are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.

36.    The Plan is a "defined contribution" pension plan under 29 U.S.C. §§ 1102(2)(A) and 1002(34), meaning that RR Donnelley's contribution to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct.at 1826.

37.    The Plan currently has about $1,340,000,000 in assets entrusted to the care of the Plan's fiduciaries. The Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not sufficiently attempt to reduce the Plan's expenses or exercise appropriate judgment to monitor the recordkeeper and managed account service provider.

38.    With 16,452 participants in 2020, the Plan had more participants than 99.90% of the defined contribution Plans in the United States that filed 5500 forms for the 2020 Plan year. Similarly, with $1,342,013,093 in assets in 2020, the Plan had more assets than 99.85% of the defined contribution Plans in the United States that filed 5500 forms for the 2020 Plan year.

## DEFINED CONTRIBUTION INDUSTRY

39.    Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. An employer may also make matching contribution based on an employee's elective deferrals.

40.    Employees with money in a plan are referred to as "participants" under ERISA Section 3(7), 29 U.S.C. § 1002(7).

41.     Although RR Donnelley contributed significant amounts in employer matching contributions to Plan participants during the Class Period, these matching contributions are irrelevant to whether a Plan has paid excessive plan recordkeeping fees or investment fees.

42.     While contributions to a plan account and the earnings on investments will increase retirement income, fees and expenses paid by the plan may substantially reduce retirement income. Fees and expenses are thus a significant factor that affect plan participant's investment returns and impact their retirement income.

43.     Employers must consider the fees and expenses paid by a plan. Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.

44.     Employers must: (1) establish a prudent process for selecting investment options and service providers; (2) ensure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided; and (3) monitor investment options and service providers once selected to make sure they continue to be appropriate choices.

## Recordkeeping Services

45.     Defined contribution plan fiduciaries of mega 403(b) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of mega retirement plans. Empower is one such recordkeeper.

46.     These recordkeepers deliver all the essential recordkeeping and related administrative ("RKA") services through standard, bundled offerings of the same level and quality.

47.    There are two types of essential RKA services provided by all recordkeepers. For mega plans with substantial bargaining power (like the Plan), the first type, "Bundled RKA," is provided as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided in retirement industry parlance on an "all-you-can-eat" basis.) The Bundled RKA services include, but are not limited to, the following standard services:

A.    Recordkeeping;

B.    Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

C.    Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

D.    Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

E.    Maintenance of an employer stock fund (if needed);

F.    Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

G.    Plan consulting services including assistance in selecting the investments offered to participants;

H.    Accounting and audit services including the preparation of annual reports, e.g., Form 5500 (not including the separate fee charged by an independent third-party auditor);

I.    Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan (which would not include separate legal services provided by a third-party law firm); and

J.    Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules.

48.     The second type of essential RKA services, hereafter referred to as "Ad Hoc RKA" services, provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees).

49.     These "Ad Hoc RKA" services typically include, but are not limited to, the following:

> A.     Loan processing;
>
> B.     Brokerage services/account maintenance;
>
> C.     Distribution services; and
>
> D.     Processing of Qualified Domestic Relations Orders (QDROs).

50.     For mega plans, like the RR Donnelley Plan, any minor variations in the level and quality of RKA services described above and provided by recordkeepers has little to no material impact on the fees charged by recordkeepers.

51.     All recordkeepers quote fees for the Bundled RKA services on a per participant basis without regard for any individual differences in services requested, which are treated by the recordkeepers as immaterial because they are, in fact, inconsequential from a cost perspective to the delivery of the Bundled RKA services.

52.     The vast majority of fees earned by recordkeepers typically come from the bundled fee for providing the Bundled RKA services as opposed to the Ad Hoc RKA services.

53.     Because dozens of Recordkeepers can provide the complete suite of required RKA services, plan fiduciaries can ensure that the services offered by each specific recordkeeper are apples-to-apples comparisons.

54.     Plan fiduciaries use the Bundled RKA fee rate as the best and most meaningful way to make apples-to-apples comparisons of the recordkeeping fee rates proposed by recordkeepers.

55.     Plan fiduciaries routinely request bids from recordkeepers by asking what the recordkeeper's Bundled RKA revenue requirement is to administer the plan. And they request that the Bundled RKA revenue requirement be expressed as either a flat per participant fee rate or an asset-based fee rate, although the use of an asset-based fee structure is not a best practice and permits recordkeepers to increase revenue without necessarily providing any additional value in services.

56.     While there may be minor differences in the way the Bundled RKA services are delivered, those differences are deemed immaterial to the price comparisons in virtually all cases.

57.     Whether the minor differences be in the number of staff utilized for call center support, the frequency of participant communications, or the number of investment education sessions held by the plan sponsor, these differences are immaterial when considering the level and quality of services provided by the plan from a cost perspective.

58.     The RR Donnelley Plan had a standard package of Bundled RKA services, providing RKA services of a nearly identical level and quality to other recordkeepers who service other mega plans.

59.     There is nothing in the service and compensation codes disclosed by the Plan Fiduciaries in their Form 5500 filings during the Class Period, nor anything disclosed in the Participant section 404(a)(5) fee and service disclosure documents, that suggests that the annual recordkeeping and administrative services charged to Plan participants included any services that were unusual or above and beyond the standard recordkeeping and administrative services provided by all national recordkeepers to mega plans.

60.     Accordingly, the disparity between the Plan's recordkeeping fee, and the fee paid by several other similarly sized plans for the same standard bundle of RKA services,

cannot be explained by any additional services, or the quality of those services, provided by Empower to the Plan.

61.     Because recordkeepers offer the same bundles and combinations of services as their competitors, the market for defined contribution retirement plan services has become increasingly price competitive for plans that have a sizable number of participants.

62.     Over the past twenty years, the fees that recordkeepers have been willing to accept for providing retirement plan services has significantly decreased, partially because of the success of class fee litigation. Recordkeepers are willing (or competitively required) to accept a lower and more competitive fee as a result of, among other things, the competitive pressures created by greater information becoming available to plan fiduciaries and the reduction in opaque fee structures.

63.     By the start of, and during the entire Class Period, the level of fees that recordkeepers have been willing to accept for providing RKA has stabilized, and has not materially changed for mega plans, including the RR Donnelley Plan. In other words, reasonable recordkeeping fees paid in 2018 are representative of the reasonable fees during the entire Class Period.

64.     The underlying cost to a recordkeeper of providing recordkeeping to a defined contribution plan is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan. As a plan gains more participants, the reasonable market rate for the services provided by the recordkeeper will decline.

65.     The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

66.     As a result, recordkeepers make separate contractual arrangements with mutual fund providers. For example, recordkeepers often collect a portion of the total expense

ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

67.     Recordkeepers typically collect their fees through direct payments from the plan or through indirect compensation such as revenue sharing, or some combination of both.

68.     Regardless of the pricing structure that the plan fiduciary negotiates with a service provider, and Plaintiffs express no preference, the amount of compensation paid to service providers, including the recordkeepers, must be reasonable (not the *cheapest* or *average*) given the applicable market.

69.     As a result, plan fiduciaries must understand the total dollar amounts paid to the recordkeeper and be able to determine whether the compensation is objectively reasonable by understanding the market for such recordkeeping services.

**<u>Managed Account Service Fees</u>**

70.     During the Class Period, Defendants selected and made available to Plan participants managed account services.

71.     In general, managed account services are investment services under which a participant pays a fee to have a managed account provider invest his account in a portfolio of preselected investment options.

72.     Managed account providers "generally offer the same basic service—initial and ongoing investment management of a 401(k)-plan participant's account based on generally accepted industry methods." THE UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE ("GAO"), *401(K) PLANS: Improvements Can Be Made to Better Protect Participants in Managed Accounts*, at 14 (June 2014), available at https://www.gao.gov/assets/670/664391.pdf.

73.     The assets of a participant signing up for a managed account service are generally managed based upon a program designed by the managed account provider that purportedly customizes the participant's portfolio based upon factors such as their risk tolerance and the number of years before they retire.

74.     In practice, however, there is often little to no material customization provided to participants which results in no material value to participants.

75.     In fact, many managed account services merely mimic the asset allocations available through a target date fund while charging additional unnecessary fees for their services.

76.     Participants who sign up for managed account services are generally charged an annual fee that is a percentage of the participant's account balance. The fee rates for these services are often tiered. For example, the first $50,000 of assets may be charged a certain fee rate, the next $25,000 in assets at a lower fee rate, and all remaining assets at a still-lower fee rate. This is appropriate because the marginal cost to manage the additional assets for the participant is essentially $0.

77.     In other words, the cost to manage the account of a participant with $25,000 is the same as the cost to manage the account of a participant with $250,000. The economies of scale for manages account services are even greater than for recordkeeping.

78.     The participant has no control over the fee rate they are charged if they use the managed account service. The fee levels are determined at the plan level through a contractual agreement between the managed account provider and plan fiduciaries.

79.     For at least the past decade, larger plans have been able to negotiate multiple facets of the fees charged by managed account providers such as both the asset levels at which a particular fee tier starts (e.g., the highest tier applies to the first $25,000 versus the first $100,000), as well as the fee rate charged at each asset level.

80.     As with any service provider, one of the most important factors when selecting a managed account provider is fees. Managed account services have historically been expensive compared to other alternatives, such as target date funds that provide the materially same service (e.g., an automated time-based dynamic asset allocation creation and rebalancing solution).

81.     This industry segment has matured over the past decade and the costs of providing managed account services have declined and competition has increased. As a result, the fees providers are willing to accept for managed account services have been declining for many years.

82.     As with retirement plan service services, prudent fiduciaries will regularly monitor the amount of managed account service fees the plan is paying and will ensure the fees are reasonable compared to what is available in the market for materially similar services.

83.     The most effective way to ensure a plan's managed account service fees are reasonable is to periodically solicit bids from other managed account service providers.

84.     As a result, a prudent plan fiduciary ensures that the fee rates are tiered as is common in the retirement plan industry, especially for larger plans.

85.     Defendants caused Plan Participants to pay excessive fees for the managed account services it made available to Plan participants through Financial Engines by not periodically soliciting bids from other managed account service providers.

86.     The excessive fees paid by Plan participants using the managed account service were not warranted and did not provide any material value or benefit to those Plan Participants.

## THE PLAN

87.     At all relevant times, the Plan's fees were excessive when compared with other comparable 401(k) Plans offered by other sponsors that had similar numbers of plan participants, similar amounts of money under management, and that received similar retirement plan and managed account services.

88.     During the Class Period, Defendants breached their duties owed to the Plan, to Plaintiffs and all other Plan Participants, by: (1) failing to monitor the Retirement Plan Service ("RPS" or "RKA" or "recordkeeping") fees paid by the plan to ensure that they were reasonable and, as a result, authorizing the plan to pay objectively unreasonable and excessive RPS/RKA fees, relative to the RPS/RKA received; (2) authorizing the Plan to pay unreasonably high fees for managed account services; and (3) failing to adequately disclose to Plan participants fees associated with the Plan in order for them to be able to make informed investment decisions.

89.     Defendants' mismanagement of the Plan, to the detriment of Plaintiffs, Plan participants and beneficiaries, breached the fiduciary duties of prudence in violation of 29 U.S.C. §1104.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING ITS RECORDKEEPER

90.     A plan fiduciary is required to fully understand all sources of revenue received by its recordkeeper. It must regularly monitor that revenue to ensure that the compensation received is, and remains, reasonable for the quality and level of services provided.

91.     Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, through soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan.

92.     Prudent plan fiduciaries can easily and inexpensively receive a quote from other recordkeepers to determine if their current level of recordkeeping fees is reasonable in light of the level and quality of recordkeeper fees.

93.     Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide the same (or better) level and qualities of services for a more competitive reasonable fee if necessary.

94.     A benchmarking survey alone is inadequate. Such surveys skew to higher "average prices," that favor inflated recordkeeping fees. To receive a truly "reasonable" recordkeeping fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a regular basis.

95.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

96.     First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

97.     Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

98.     Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary

can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

99. Accordingly, the only way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of recordkeeping services is to obtain competitive bids from other providers in the market, This will generally include conducting an RFP at reasonable intervals, and immediately if the Plan's retirement plan service expenses have grown significantly or appear high in relation to the general marketplace or if the Plan's demographics are materially impacted by a merger or spin-off.

<u>PLAN FIDUCIARIES DID NOT EFFECTIVELY MONITOR
RECORDKEEPING FEES AND THE PLAN THUS PAID
UNREASONABLE RECORDKEEPING FEES</u>

100. A Plan Fiduciary must continuously monitor its recordkeeping fees fees by regularly soliciting competitive bids to ensure fees paid to service providers are reasonable.

101. During the Class Period, Defendants knew or should have known that they must regularly monitor the Plan's recordkeeping fees paid to service providers, including but not limited to Empower.

102. During the Class Period, Defendants failed to regularly monitor the Plan's recordkeeping fees paid to service providers, including but not limited to Empower.

103. During the Class Period, Defendants knew or should have known that they must regularly solicit quotes and/or competitive bids from covered service providers, including but not limited to Empower, in order to avoid paying objectively unreasonable fees for recordkeeping fees.

104. During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from service providers, including but not limited to Empower, in order to avoid paying unreasonable fees for recordkeeping fees.

105. During the Class Period, Defendants knew or should have known that it was in the best interests of the Plan's participants to ensure that the Plan paid no more than a competitive reasonable fee for recordkeeping.

106. During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants failed to ensure that the Plan paid no more than a competitive reasonable fee for recordkeeping.

107. During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not have a process in place to ensure that the Plan paid no more than a competitive reasonable fee for recordkeeping. Alternatively, to the extent there was a process in place that was followed by Defendants, it was done so ineffectively given the objectively unreasonable fees paid for recordkeeping.

108. During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any objectively reasonable and/or prudent efforts to ensure that the Plan paid no more than a competitive reasonable fee for recordkeeping.

109. During the Class Period, and because Defendants failed to regularly monitor the Plan's recordkeeping fees paid to service providers, including but not limited to Empower, the Plan's retirement plan service fees were significantly higher than they would have been had Defendants engaged in this process.

110. During the Class Period, and because Defendants did not regularly solicit quotes and/or competitive bids from service providers, including but not limited to Empower, before and/or when paying fees for recordkeeping, the Plan's recordkeeping fees were significantly higher than they would have been had Defendants engaged in these processes. Alternatively, to the extent there was a process in place that was followed by Defendants, it was done so ineffectively given the objectively unreasonable fees paid for recordkeeping.

111. During the Class Period and because Defendants did not engage in any

objectively reasonable and/or prudent efforts when paying fees for recordkeeping, including but not limited to Empower, these recordkeeping fees were significantly higher than they would have been had Defendants engaged in these efforts.

112.    The Plan fiduciaries understood the importance of plan fees and expenses on the ability of Plan participants to reach their retirement savings goals.  For example, in its 2018 "Notice of Investment Returns & Fee Comparison" ("Notice"), the Plan fiduciaries' were required to disclose to Plan participants information about the plan noting that "[f]ees and expenses related to your plan can affect the overall long-term value of your account. The investment options you choose can also affect your account.  It is important for you to have a clear understanding of the investment options available through your plan and the fees and expenses that are part of your plan."

113.    In its Notice, the Plan fiduciaries disclosed to Plan participants a "description of non-investment management fees and expenses that may be charged to your account," which included "recordkeeping, accounting, legal, consulting, or other administrative fees that may be charged to your account."

114.    The 2018 Notice disclosed that participants would be charged an annual "Participant Account Maintenance" Fee of $101.40 "to pay for some or all of the plan's general administrative expenses which may include costs for recordkeeping, advisory, legal and accounting services."

115.    The Plan fiduciaries Notice describes a standard bundle of recordkeeping services that could be provided by several other quality recordkeepers.  There is nothing contained in the Notice that describes any services that would warrant fees in excess of the fees that other recordkeepers would provide to the Plan for materially the same level and scope of services.

116.    An evaluation and analysis of the 2018 5500 filings of plans with similar

numbers of participants enables a determination of a reasonable fee that could have been obtained by a prudent plan fiduciary for a materially similar bundle of services from other quality retirement plan service providers.

117. The Plan's participant Fee Disclosure Notices establish that the fees Plan participants paid through the "Participant Account Maintenance" fee was the absolute minimum amount Plan participants actually paid for recordkeeping and that amount is set forth in the chart below.

118. Notably, based on the Plan's participant Fee Disclosure documents, the recordkeeping fees *do not include* the following fees charged by Empower: 1) Loan Origination fees; 2) Domestic Relations Order Fees; 3) Brokerage Fees; and 4) Wire Special Handling Charges, among other immaterial fees charged separately to individual participants. Managed Account fees charged by the Advised Asset Group ("AAG") (a managed account service affiliate of Empower) are also *not included* in the recordkeeping fees.

119. When determining the recordkeeping fees paid by comparable plans, revenues from loan fees, Domestic Relations Order fees, Brokerage Fees, if any, and other similar fees *were included*. For the comparable plan fees, all direct compensation to all covered service providers was included except any managed account/participant advice fees. Additionally, any revenue sharing related to the investments in the comparable plans was also included unless the 5500 forms and accompanying financial statements and the Notes thereto made it clear that the revenue sharing was returned to participants. In this way, the comparisons set forth below tend to *overstate* the recordkeeping fees of the comparable plans and *understate* the recordkeeping fees of the Plan.

120. Despite the methodology utilized being favorable to Defendants, the Plan's effective fee rate per participant was more than double the fee rate of the comparable plans.

This leads to an inference that the Plan fiduciaries were imprudent in how they structured the delivery of recordkeeping to their participants.

121.     From the years 2014 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below shows the actual year-end recordkeeping fees illustrating that the Plan had on average had 24,327 participants and paid an average effective annual recordkeeping fee ("participant account maintenance fee") of at least approximately $1,894,856, which equates to an average of at least approximately $78 per participant.

122.     As can be seen from the table below, during 2014 and 2015 the Plan had more than twice as many participants as compared to 2016-2020.  That is because in October 2016 the Plan's sponsor, R.R. Donnelley & Sons Company, completed its spin-offs of its publishing, retail print services, and office products businesses. These spin-offs resulted in a number of plan participants and their assets becoming participants in two new plans.

## Retirement Plan Services (RPS) Fees

|  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Average |
|---|---|---|---|---|---|---|---|---|
| **Participants** | 41,651 | 43,115 | 16,966 | 17,484 | 17,271 | 17,349 | 16,452 | *24,327* |
| **Est. RPS Fees** | $2,808,943 | $2,907,676 | $1,144,187 | $1,775,615 | $1,752,699 | $1,494,876 | $1,379,994 | *$1,894,856* |
| **Est. RPS Per Participant** | $67 | $67 | $67 | $102 | $101 | $86 | $84 | *$78* |

123.     As a result, in 2015 the Plan was relatively larger having more participants than 99.98% of plans and more assets than 99.95% of plans thereby having substantial leverage to negotiate reasonable fees. As noted above, however, even after the corporate spin-offs, the Plan was still in the top 1% of plans in terms of both assets and participants giving it substantial leverage.

124.     Prior to the corporate spin-offs, from the years 2014 through 2015 and based upon information derived publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to

Defendants during the Class Period, the table below illustrates the annual recordkeeping fees paid by other comparable plans with a similar number of participants, compared to the average annual recordkeeping fees paid by the Plan during 2014 and 2015.

125.    The fees paid by the comparable plans in the table below are derived from publicly available information reported in 5500 forms and the accompanying financial statements that are required to be filed with the Department of Labor each year. An analysis of these documents allows for a determination of the direct and indirect compensation received by recordkeepers.

**Comparable Plans' RPS Fees Based on Publicly Available Information from Form 5500**

| Plan | Participants | Assets | RPS Fee | RPS Fee /pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| Philips North America 401(K) Plan | 29,070 | $4,129,162,920 | $1,158,423 | $40 | Vanguard | White |
| Kindred 401(k) | 34,092 | $1,299,328,331 | $1,196,564 | $35 | T. Rowe Price | White |
| Deseret 401(K) Plan | 34,357 | $3,381,868,127 | $873,028 | $25 | Great-West | White |
| Thermo Fisher Scientific Inc. 401(K) Retirement Plan | 35,739 | $4,320,623,419 | $713,758 | $20 | T. Rowe Price | White |
| Tesla, Inc. 401(K) Plan | 39,720 | $448,783,109 | $1,178,160 | $30 | Fidelity | White |
| Publicis Benefits Connection 401K Plan | 42,316 | $2,547,763,175 | $1,547,849 | $37 | Fidelity | White |
| **RR Donnelley Savings Plan Average Fee** | **42,383** | **$2,621,877,431** | **$2,858,310** | **$67** | **Great-West** | **Red** |
| Caesars Entertainment Corporation Savings & Retirement Plan | 43,066 | $1,407,019,418 | $1,690,906 | $39 | Alight | White |
| Advocate Health Care Network Retirement Savings Plan 401(K) | 44,893 | $2,954,809,557 | $1,421,458 | $32 | Alight | White |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 47,358 | $3,104,524,321 | $1,310,600 | $28 | Vanguard | White |

126.    Prior to the corporate spin-offs, from the years 2014 through 2015 and based upon information derived from publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to Defendants during the Class Period, the graph below illustrates the annual recordkeeping

fees paid by other comparable plans with a similar number of participants and a similar amount of plan assets receiving a similar level and quality of services, compared to the average annual retirement plan service fees paid by the Plan (as identified in the table above), with the white data points representing retirement plan service fees that recordkeepers offered to (and were accepted by) comparable plans.



127.    Prior to the corporate spin-offs, from the years 2014 to 2015 and based upon information derived from publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrates that the Plan paid an effective average annual recordkeeping fee of at least $67 per participant.

128.    Prior to the corporate spin-offs, from the years 2014 through 2015 and based upon information derived from publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to

Defendants during the Class Period, the table and graph above illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual recordkeeping fee of around $31 per participant, if not lower.

129.    After the corporate spin-offs, from the years 2016 through 2020 and based upon information derived from 408(b)(2) plan sponsor disclosures, 404(a)(5) participant fee disclosures, and publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to Defendants during the Class Period, the table below illustrates the annual recordkeeping fees paid by other comparable plans with a similar number of participants receiving a similar level and quality of services, compared to the average annual recordkeeping fees paid by the Plan from 2016 through 2020.

130.    The fees paid by the comparable plans in the table below are derived from 408(b)(2) plan sponsor disclosures, 404(a)(5) participant fee disclosures, and publicly available information reported on 5500 forms and the accompanying financial statements. An analysis of these documents allows for a determination of the direct and indirect compensation received by the recordkeepers. Costs related to testing, participant communications, and other standard services provided by the retirement plan service provider are all immaterial. Plans of the size of the RR Donnelley Plans receive all of these services included with no additional fees.

**Comparable Plans' RPS Fees Based on Publicly Available Information from Form 5500**

| Plan | Participants | Assets | RPS Fee | RPS Fee /pp | Recordkeeper | Graph Color |
|------|------|------|------|------|------|------|
| Vibra Healthcare Retirement Plan | 9,750 | $107,652,510 | $341,597 | $35 | Great-West | White |
| Republic National 401(K) Plan | 9,922 | $671,989,837 | $442,799 | $45 | Great-West | White |
| Southern California Permanente Medical Group Tax Savings Retirement Plan | 10,770 | $773,795,904 | $333,038 | $31 | Vanguard | White |
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $460,727 | $35 | Fidelity | White |
| Dollar General Corp 401(k) Savings and Retirement Plan | 16,125 | $355,768,325 | $635,857 | $39 | Voya | White |
| Michelin 401(K) Savings Plan | 16,521 | $2,391,639,166 | $570,186 | $35 | Vanguard | White |
| **RR Donnelley Savings Plan Average Fee** | **17,104** | **$1,186,261,451** | **$1,509,474** | **$88** | **Great-West** | **Red** |
| Sedgwick 401(K) Savings Plan | 17,459 | $801,477,209 | $823,802 | $47 | Merrill Lynch | White |
| Fedex Office And Print Services, Inc. 401(K) Retirement Savings Plan | 17,652 | $770,290,165 | $521,754 | $30 | Vanguard | White |
| Pilgrim's Pride Retirement Savings Plan | 18,356 | $321,945,688 | $457,500 | $25 | Great-West | White |
| JBS 401(K) Savings Plan | 19,420 | $374,330,167 | $539,206 | $28 | Great-West | White |

131.    After the corporate spin-offs, from the years 2016 through 2020 and based upon information derived from 408(b)(2) plan sponsor disclosures, 404(a)(5) participant fee disclosures, and publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to Defendants during the Class Period, the graph below illustrates the recordkeeping fees (participant account maintenance service fees) paid by other comparable plans with a similar number of participants receiving a similar level and quality of services, compared to the average annual recordkeeping fees paid by the Plan (as identified in the table above),

with the white data points representing retirement plan service fees that

retirement plan providers offered to (and were accepted by) comparable Plans.



132.    After the corporate spin-offs, from the years 2016 to 2020 and based

upon information derived from 408(b)(2) plan sponsor disclosures, 404(a)(5)

participant fee disclosures, and publicly available information reported on 5500 forms

and the accompanying financial statements, which was equally or even more easily

available to Defendants during the Class Period, the table and graph above illustrates

that the Plan paid an effective average annual recordkeeping fee of $88 per

participant.

133.    After the corporate spin-offs, from the years 2016 through 2020 and

based upon information derived from 408(b)(2) plan sponsor disclosures, 404(a)(5) participant fee disclosures, and publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual recordkeeping fee of around $33 per participant, if not lower.

134. From the years 2014 through 2020 and based upon information derived from 408(b)(2) plan sponsor disclosures, 404(a)(5) participant fee disclosures, and publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other Plans of similar sizes with similar level and quality of services, had Defendants been acting in the exclusive best interest of the Plan's participants, the Plan actually would have paid significantly less than an average of approximately $1,894,856 per year in recordkeeping fees, which equated to an effective average of approximately $78 per participant per year.

135. From the years 2014 through 2020 and based upon information derived from 408(b)(2) plan sponsor disclosures, 404(a)(5) participant fee disclosures, and publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other Plans of similar sizes and with similar level and quality of services, had Defendants been acting in the best interests of the Plan's participants, the Plan actually would have paid on average a reasonable

effective annual market rate for recordkeeping of approximately $790,677 per year, which equates to approximately $33 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan Fiduciary would not agree to pay more than double what they could otherwise pay for materially the same level and quality of recordkeeping.

136.     From the years 2014 through 2020 and based upon information derived from 408(b)(2) plan sponsor disclosures, 404(a)(5) participant fee disclosures, and publicly available information reported on 5500 forms and the accompanying financial statements which was equally or even more easily available to Defendants during the Class Period, the Plan additionally cost its participants on average approximately $1,104,179 per year in recordkeeping fees, which equates to on average approximately $45 per participant per year.

137.     From the years 2014 to 2020, and because Defendants did not act with prudence, and as compared to other Plans of similar sizes and with similar level and quality of services, the Plan actually cost its participants a total minimum amount of approximately $7,729,252 in unreasonable and excessive recordkeeping fees.

138.     From the years 2014 to 2020, based upon information derived from 408(b)(2) plan sponsor disclosures, 404(a)(5) participant fee disclosures, and publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to Defendants during the Class Period, because Defendants did not act prudently, and as compared to other Plans of similar sizes and with similar level and quality of services, the Plan actually

cost its Participants (when accounting for compounding percentages) a total, cumulative amount in excess of $12,752,423 in recordkeeping fees.

139.    During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not regularly and/or reasonably assess the Plan's recordkeeping fees.

140.    During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the recordkeeping fees it paid to Empower vis-à-vis the fees that other recordkeepers would charge for the same level and quality of services.

141.    During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's recordkeeping fees it paid to Empower, but Defendants simply failed to do so.

142.    During the entirety of the Class Period and had Defendants engaged in any regular and/or reasonable examination and competitive comparison of the recordkeeping fees it paid to Empower, it would have realized and understood that the Plan was objectively compensating Empower unreasonably and inappropriately for its size, scale, and level and quality of services, passing these objectively unreasonable and excessive fee burdens to Plaintiffs and the Plan participants.

143.    The Plan recordkeeping fees were also excessive relative to the recordkeeping services received, since the quality and level of such services are

standard for mega 401(k) plans like this Plan and are provided on an "all-you-can-eat-basis," based primarily on the number of participants a plan has. Any difference in recordkeeping fees between comparable plans is not explained by the level and quality of services each recordkeeper provides.

144. Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, no reasonable tradeoffs existed here because recordkeepers for mega plans are providing the exact same level and quality of services.

145. Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing recordkeepers, Empower, and Defendants could have obtained the same recordkeeping services for less from other, similar recordkeepers.

146. The higher cost recordkeeping services selected by Defendants were substantially identical to lower-cost recordkeeping services available in the market as highlighted by the chart above.

147. Plaintiff paid these excessive recordkeeping fees in the form of direct compensation to the Plan and suffered injuries to his Plan account as a result.

148. Plaintiff has participated in several 401(k) plans from several employers and there have been no material differences in the services that they have received.

149. During the entirety of the Class Period and by failing to recognize that

the Plan and its participants were being charged much higher recordkeeping fees than they should have been and/or by failing to take effective remedial actions including removing Empower as the Plan recordkeeper, Defendants breached their fiduciary duty of prudence to Plaintiffs and Plan participants, causing significant monetary harm to their Plan retirement accounts.

150. During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher recordkeeping fees than they should have been and/or by failing to take effective remedial actions, Defendants breached their fiduciary duties of prudence to Plaintiffs and the Plan participants.

## THE PLAN'S FIDUCIARIES DID NOT EFFECTIVELY MONITOR MANAGED ACCOUNT SERVICE FEES AND, AS A RESULT, THE PLAN PAID UNREASONABLE MANAGED ACCOUNT SERVICE FEES

151. Since at least 2014, Defendants have retained Empower's subsidiary, Advised Assets Group, LLC ("AAG") (also referred to as "Empower Retirement Advisory Services Professional Management Program") and Financial Engines, to provide managed account services to the Plan.

152. According to Defendants' participant 2018 Fee Disclosure document, AAG purported to provide participants with an asset allocation mix of funds available within the Plan.

153. Plaintiff Lafreniere was charged between 55 and 60 basis points on an annual basis for using AAG.

154.    For this service, up through the end of 2018, Defendants required participants to pay an annual fee of at least 0.60% on the first $100,000, 0.45% on the next $150,000, and 0.30% on assets greater than $250,000.

155.    For this service, up through the end of 2021, Defendants required participants to pay an annual fee of at least 0.55% on the first $100,000, 0.45% on the next $150,000, and 0.30% on assets greater than $250,000.

156.    The table below illustrates the fee rates paid by similarly situated plans for virtually and materially identical managed account services.

| Managed Account service fee rates of other large defined contribution plans | Fee on 1st Tier | Fee on 2nd Tier | Fee on 3rd Tier |
|---|---|---|---|
| RR Donnelley - Empower's "Retirement Advisory Services Professional Management Program" service (2017-2018) | 0.60% | 0.45% | 0.30% |
| AGFA Healthcare Corp. Employee Savings Plan (2018) | 0.40% | 0.30% | 0.20% |
| Caterpillar Sponsored 401(k) Plans (2016) | 0.40% | 0.30% | 0.20% |
| Citi Ret. Savings Plan (2015) | 0.35% | 0.30% | 0.25% |
| JC Penney 401(k) Savings Plan (2015) | 0.35% | 0.25% | 0.10% |
| Comcast Corp. Ret. Investment Plan (2019) | 0.00% | 0.30% | 0.20% |

157.    As illustrated above, Plaintiff Lafreniere and other Plan participants are paying fee rates greater than participants in similarly situated plans (see portions of the table highlighted in red.)

158.    There are a number of other managed account providers whose services are virtually identical to the services provided to Plan participants through AAG and Financial Engines, whose fees range from 0.25% to 0.30% on all assets, e.g., Betterment, Vanguard, and Charles Schwab, for plans much smaller than the Plan.

159.    The Kimberly-Clark 401(k) Profit Sharing and Retirement Plan, a similar mega Plan to the RR Donnelley Plan, provided in 2020 managed account

services through Fidelity to its participants at a much lower price on the following schedule: no fee up to the first $5000, 0.25% up to $100,000, 0.15% on the next $150,000, and 0.10% on assets greater than $250,000.

160.     As a result, the fee rates paid by Plaintiff Lafreniere and Plan participants for the AAG managed account services, as well as to Financial Engines, were excessive and not reasonable given the Plan's size and negotiating power.

161.     The Plan's managed account services added no material value to Plaintiff Lafreniere or to participants to warrant any additional fees. The asset allocations created by the managed account services were not materially different than the asset allocations provided by the age-appropriate target date options ubiquitously available to Defendants in the market.

162.     Offering asset allocation solutions to plan participants in the form of target date funds is a best practice, and much less expensive than managed accounts.

163.     Moreover, the purpose of all the managed account services selected and made available by Defendants to Plan participants is identical, i.e., to provide an automated time-based dynamic asset allocation creation and rebalancing solution that reallocates the asset allocation over time as circumstances change.

164.     As a result, based on the value provided, the reasonable fee for Plan's managed account service was zero or very close to zero.

165.     Although the United States Supreme Court noted in Hughes that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary

may make based on her experience and expertise," Hughes, 142 S. Ct. at 742, these managed account allegations are not about reasonable tradeoffs between managed account service providers offering a different level or quality of services.

166. Rather, Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing managed account service provider, and Defendants could have obtained the materially same managed account services for less through another provider if it had solicited competitive bids for the same services.

167. A prudent fiduciary would have conducted competitive solicitation of bids (including issuing an RFP, if necessary), as well as evaluating the incremental value provided to Plan participants, to ensure that the amounts paid by the Plan for managed account services were reasonable. Had Defendants done so, the Plaintiff Lafreniere and other Plan participants would not have paid the excessive managed account service fees that it did to AAG and Financial Engines.

168. Based on the excessive amounts paid by Plaintiff Lafreniere and other Plan participants for managed account services, it is reasonable to infer that Defendants failed to prudently monitor and manage the Plan's managed account services.

169. Defendants' failure to properly monitor or control fees for the Plan's managed account services resulted in Plaintiff Lafreniere and other Plan participants paying excessive and unreasonable fees and constitutes a separate and independent breach of the fiduciary duties of prudence.

170.    The AAG Managed account service, as well as that provided by Financial Engines, was offered by Empower to increase the revenue generated through its relationship with the Plan.

171.    Empower promoted the AAG managed account service over other potential managed account solutions because Empower earned more revenue when Plan participants, like Plaintiff Lafreniere, used the AAG Managed Account and Financial Engine services.

172.    Defendants separately violated their duty of prudence to Plaintiff Lafreniere and other Plan participants by charging excessive managed account fees, costing them millions of dollars of lost retirement earnings.

173.    As a result, based on the value provided, the reasonable fee for Plan's managed account services provided by AAG and Financial Engines was zero or very close to zero, and the use of the managed account services provided by these service providers cost the Plan millions of dollars of wasted managed account service provider fees:

| Advised Assets Group, LLC - Schedule C - Direct Compensation | | | | | | | |
|---|---|---|---|---|---|---|---|
| Provider | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Total |
| ADVISED ASSETS GROUP, LLC | $710,885 | $805,900 | $400,694 | $488,258 | $502,557 | $522,786 | **$3,431,080** |
| Compounding Percentage (VIIIX) | 1.39% | 11.95% | 21.82% | -4.41% | 31.48% | 18.41% | |
| Estimated Cumulative Damages | $710,885 | $1,601,736 | $2,351,928 | $2,736,466 | $4,100,463 | $5,378,144 | |

174.    Defendants' failure to properly monitor or control fees for the Plan's managed account service cost resulted in Plan participants paying excessive and objectively unreasonable fees, constitutes a separate and independent breach of the

fiduciary duty of prudence, and cost Plaintiff Lafreniere and other Plan participants who used these managed account services millions of dollars of harm to their retirement accounts.

<u>FAILURE TO FULLY DISCLOSE FEES CHARGED OR CREDITED<br>TO THE PLAN INVESTMENTS</u>

175.    ERISA imposes a duty on plan administrators to provide to plan participants on a "regular and periodic basis . . . sufficient information regarding the plan, including fees and expenses, and regarding designated investment alternatives, including fees and expenses attendant thereto, to make informed decisions with regard to the management of their individual accounts."  29 C.F.R. §2550-404a-5(a).

176.    In order to satisfy this requirement, a plan administrator must provide (among other things) (1) an "identification of any designated investment managers," (2) "an explanation of any fees and expenses that may be charged against the individual account of a participant or beneficiary … not reflected in the total annual operation expenses of any designated investment alternatives," and (3) "at least quarterly, a statement" reflecting the dollar amount and nature of those expenses "actually charged," along with a "description of the services to which the charges relate." 29 C.F.R. §2550- 404a-5(b)-(d).

177.    Defendants failed to adequately explain the "Participant Account Maintenance" fee charged to participants in the Plan.

178.    More specifically, the participant fee disclosure documents do not enable a Plan participant to understand all the services provided in exchange for the "Participant Account Maintenance" fee.  A reasonable reading of the participant fee

disclosure documents would lead a participant to believe that Empower was receiving the vast majority of the "Participant Account Maintenance" fees. Even by reviewing quarterly statements, the Plan's 5500 Forms, and the 404a-5 participant fee disclosures, it is unclear who is getting paid what for what services, the method of the payment, and if the service is being paid by RR Donnelley or by the Plan (participant).

179. Moreover, in at least one year of the Class Period, the Plan fiduciaries required Plan participants to pay at least $400,000 more than was required by the recordkeeper to deliver the services to the Plan. Then, instead of returning those excess fees to Plan participants, the Plan fiduciaries maintained those assets as "Unallocated Plan Assets," basically a slush fund for at least four years of the Class Period. The Plan fiduciaries' decision to refuse to return the excess fees to Plan participants was not prudent.

180. At least four of the Participant Fee Disclosure documents do not even provide basic information about the investment options made available to the Plan such as the goals, investment strategies, investment managers, and risk profile of each investment option.

181. The Defendants' incomplete and inadequate disclosures are a clear violation of ERISA disclosure requirements imposed on all plan administrators and are also evidence that the Defendants were imprudent in the administration of the Plan.

182.     The failure to disclose all the information a participant would need to make an informed investment decision, as required under 29 C.F.R. §2550-404a-5(a), breached the fiduciary obligations of prudence that Defendants owed to Plaintiffs and members of the Class.

183.     Plan participants have been damaged in the form of unknowingly paying higher fees for recordkeeping through Defendants' incomplete and erroneous disclosures.

## CLASS ACTION ALLEGATIONS

184.     29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

185.     In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the RR Donnelley Savings Plan beginning six (6) years before the commencement of this action and running through the date of judgment, excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan.

186.     The Class includes on average more than 25,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

187.     There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to

the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

- Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

- Whether Defendants breached their fiduciary duties to the Plan;

- What are the losses to the Plan resulting from each breach of fiduciary duty; and

- What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

188.    Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs were participants during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

189.    Plaintiffs will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they are participants in the Plan during the Class period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

190.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants concerning its discharge of fiduciary duties to the Plan and personal

liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

191.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

192.    Plaintiffs' attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

193.    The claims brought by the Plaintiffs arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts. The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in individual participants' Plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

194.    Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

195. Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

**FIRST CLAIM FOR RELIEF**
**Breaches of Duty Prudence of ERISA, as Amended**
**(Plaintiffs, on behalf of themselves & Class against Defendant**
**Committee - Recordkeeping Fees)**

196. Plaintiffs restate the above allegations as if fully set forth herein.

197. Defendants are fiduciaries of the Plan under 29 U.S.C. §§1002(21) and/or 1102(a)(1).

198. 29 U.S.C. §1104 imposes fiduciary duties of prudence upon Defendants in their administration of the Plan.

199. Defendants, as fiduciaries of the Plan, are responsible for selecting service providers that charge reasonable recordkeeping fees.

200. During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's recordkeeping fees were reasonable; manage the assets of the Plan prudently; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

201. During the Class Period, Defendants breached their fiduciary duties of prudence to Plan Participants, including Plaintiffs, by failing to: ensure that the Plan's recordkeeping fees were reasonable, properly disclose the fees charged to participants

in the Plan in their quarterly statements or fee disclosures, manage the assets of the Plan prudently, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

202.     During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper to make sure it was providing the contracted services at reasonable costs, given the highly competitive market for recordkeeping, and the significant bargaining power the Plan had to negotiate reasonable fees.

203.     During the Class Period, Defendants breached their duty to Plan participants, including Plaintiffs, by failing to employ a prudent process by failing to evaluate the cost and performance of the Plan's recordkeeper critically or objectively in comparison to other recordkeepers providing materially identical services at a materially similar quality.

204.     Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties of prudence under 29 U.S.C. §1104(a)(1)(B).

205.     As a result of Defendants' breach of fiduciary duties of prudence with respect to the Plan, the Plaintiffs and Plan participants suffered objectively unreasonable and unnecessary monetary losses, amounting to millions of dollars.

206.     Defendants are liable under 29 U.S.C. §§1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2).

### SECOND CLAIM FOR RELIEF
**Breaches of Duty of Prudence of ERISA, as Amended
(Plaintiffs, on behalf of themselves & Class against
<u>Committee Defendants – Managed Account Service Fees)</u>**

207.     Plaintiffs restate the above allegations as if fully set forth herein.

208.     Defendants are fiduciaries of the Plan under 29 U.S.C. §§1002(21) and/or 1102(a)(1).

209.     29 U.S.C. §1104(a)(1)(B) imposes fiduciary duties of prudence upon Defendants in their administration of the Plan.

210.     Defendants, as fiduciaries of the Plan, are responsible for selecting a managed account service providers that charges reasonable managed account service fees.

211.     During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's managed account service fees were reasonable; manage the assets of the Plan prudently; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

212.     During the Class Period, among other things, Defendants imprudently caused the Plan to pay excessive managed account service fees and failed to properly

monitor and control those expenses. Each of the actions and omissions described above and elsewhere demonstrate that Defendants failed to defray reasonable expenses of the Plan, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of their fiduciary.

213.     During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's managed account providers to make sure they were providing the contracted services at reasonable costs, given the highly competitive market surrounding managed account services and the significant bargaining power the Plan had to negotiate the best fees, and to remove these service providers if they did not.

214.     During the Class Period, Defendants breached their duty to Plan Participants, including Plaintiffs, by failing to employ a prudent process by failing to evaluate the cost and performance of the Plan's managed account providers critically or objectively in comparison to other managed account options.

215.     Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. §1104(a)(1)(B).

216.     As a result of Defendants' breach of fiduciary duty of prudence with respect to the Plan, the Plaintiffs and Plan Participants suffered objectively unreasonable and unnecessary monetary losses, amounting to millions of dollars.

217.     Defendants are liable under 29 U.S.C. §§1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2).

**THIRD CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class against Defendants RR Donnelley and**
**Board – Recordkeeping Fees)**

218.     Plaintiffs restate the above allegations as if fully set forth herein.

219.     RR Donnelley, through its Board, had the authority to appoint and remove at least some members or individuals responsible for Plan recordkeeping fees on the Committee and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

220.     In light of this authority, RR Donnelley, through its Board, had a duty to monitor those individuals responsible for Plan recordkeeping fees on the Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

221.     RR Donnelley, through its Board, had a duty to ensure that the individuals responsible for Plan administration on the Committee possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to RR Donnelley.

222.     The excessive recordkeeping fees paid by the Plan inferentially suggest that RR Donnelley and the Board breached their duty to monitor the individuals they appointed to the Benefit Committee, by, among other things:

a.     Failing to monitor and evaluate the performance of individuals responsible for Plan recordkeeping fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high recordkeeping expenses;

b.     Failing to monitor the process by which Plan service providers were evaluated and failing to investigate the availability of lower-cost service providers; and

c.     Failing to remove individuals responsible for Plan recordkeeping fees whose performance was inadequate in that these individuals continued to pay the same recordkeeping fees even though using other similar comparators would have showed that maintaining Empower as a service provider was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

223.     As the consequences of the foregoing breaches of the duty to monitor recordkeeping fees, Plaintiffs and Plan participants suffered unreasonable and unnecessary monetary losses, amounting to millions of dollars.

224.     Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), RR Donnelley and its Board are liable to restore to the Plan all loses caused by its failure to adequately monitor individuals on the Committee responsible for Plan recordkeeping fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

### FOURTH CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class against Defendants RR Donnelley and Board – Managed Account Service Fees)**

225.     Plaintiffs restate the above allegations as if fully set forth herein.

226.     RR Donnelley, through its Board, had the authority to appoint and remove some of the members or individuals on the Committee responsible for Plan managed account service fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

227.     In light of this authority, RR Donnelley, through its Board, had a duty to monitor those individuals on the Committee responsible for Plan managed account service fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

228.     RR Donnelley, through its Board, had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications

and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's managed account services; and report regularly to RR Donnelley.

229. The excessive managed account fees paid by the Plan inferentially suggest that RR Donnelley and the Board breached their duty to monitor the individuals they appointed to the Benefit Committee, by, among other things:

a. Failing to monitor and evaluate the performance of individuals responsible for Plan managed account service fees on the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high managed account service expenses;

b. Failing to monitor the process by which Plan managed account providers were evaluated and failing to investigate the availability of lower-cost managed account providers; and

c. Failing to remove individuals responsible for Plan managed account service fees on the Committee whose performance was inadequate in that these individuals continued to pay the same managed account service costs even though using other similar comparators would have showed that maintaining their managed account providers was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

230.     As the consequences of the foregoing breaches of the duty to monitor for managed account service fees, the Plaintiff and Plan participants suffered unreasonable and unnecessary monetary losses, amounting to millions of dollars.

231.     Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), RR Donnelley and the Board are liable to restore to the Plan all loses caused by its failure to adequately monitor individuals on the Committee responsible for Plan managed account service fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying excessive recordkeeping fees and managed account service fees, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An Order requiring Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. §1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Defendants as necessary to effectuate relief, and to prevent Defendants' unjust enrichment;

F.  An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.  Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

H.  An award of pre-judgment interest;

I.  An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.  Such other and further relief as the Court deems equitable and just.

Dated this 17th day of June, 2022

WALCHESKE & LUZI, LLC
Counsel for Plaintiffs

s/ *Paul M. Secunda*
James A. Walcheske
Paul M. Secunda

WALCHESKE & LUZI, LLC
125 South Wacker Drive, Suite 300
Chicago, Illinois 60606
Telephone: (224) 698-2630
Fax: (262) 565-6469
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com